## COLORADO INTERSTATE GAS CO. v. FEDERAL POWER COMMISSION et al.

## CANADIAN RIVER GAS CO. v. SAME.

## COLORADO–WYOMING GAS CO. v. SAME.

### Nos. 2550, 2551, 2561.

Circuit Court of Appeals, Tenth Circuit.

May 16, 1944.

Rehearing Denied Aug. 9, 1944.

948

Elmer L. Brock and E. R. Campbell, both of Denver, Colo. (Wm. A. Dougherty and C. W. Cooper, both of New York City, on the brief), for petitioner Colorado Interstate Gas Co.

John P. Akolt, of Denver, Colo., and Charles H. Keffer, of Amarillo, Tex. (P. C. Spencer, of New York City, on the brief), for petitioner Canadian River Gas Co.

Donald C. McCreery, of Denver, Colo. (Lee, Shaw & McCreery and Wm. A. Bryans, III, all of Denver, Colo., on the brief), for petitioner Colorado-Wyoming Gas Co.

Edward H. Lange, of Washington, D. C. (Charles V. Shannon, L. W. McKernan, and Milford Springer, all of Washington, D. C., on the brief), for respondent Federal Power Commission.

Thomas H. Gibson, of Denver, Colo. (Malcolm Lindsey, of Denver, Colo., on the brief), for respondent City and County of Denver, Colo.

Before BRATTON, HUXMAN, and MURRAH, Circuit Judges.

BRATTON, Circuit Judge.

These cases bring here for review orders of the Federal Power Commission requiring Canadian River Gas Company, Colorado Interstate Gas Company, and Colorado-Wyoming Gas Company to make reductions in their respective rates for natural gas transported in interstate commerce and sold for resale for ultimate public consumption. Reference will be made to the companies as Canadian, Colorado, and Wyoming, respectively.

The City and County of Denver filed with the Commission a complaint charging that the rates of Canadian, Colorado, and Public Service Company were unjust and unreasonable; similarly, the Public Service Commission of the State of Wyoming filed with the Commission a complaint charging that the rates of Wyoming were unjust and unreasonable; and the Commission instituted on its own motion an investigation into the reasonableness of the rates of Canadian, Colorado, and Wyoming. Canadian and Colorado filed with the Commission their joint application for a stay of the order directing that the investigation be instituted; the Commission denied the application; the companies sought review; and it was denied on the ground that the order was merely preliminary and procedural and therefore not open to review. Canadian River Gas Co. v. Federal Power Commission, 10 Cir., 110 F.2d 350; Id., 10 Cir., 113 F.2d 1010, certiorari denied 311 U.S. 693, 61 S.Ct. 76, 85 L.Ed. 449. By order of the Commission, the three proceedings were consolidated for purposes of hearing. At the conclusion of extended hearings, the Commission found that the revenues and costs of the companies for 1939 were fairly representative of the relationship which would exist between such items in the immediate future, and that use of the figures for that year resolved most of the doubts as to future operating conditions in favor of the companies. Using the figures for 1939, the Commission determined that the rates and charges of Canadian for gas sold to Colorado and Clayton Gas Company were unjust and unreasonable to the extent of $561,000 annually; that the rates and charges of Colorado were unjust and unreasonable in the amount of $2,065,000 annually; and that the rates of Wyoming were unjust and unreasonable in the sum of $119,000. The Commission ordered the companies to reduce their rates and charges by not less than such amounts, respectively, and directed that schedules of rates be filed effecting the reductions. The companies applied for a rehearing; the Commission denied the applications; and the companies severally sought review.

Southwestern Development Company, through its wholly owned subsidiary, Amarillo Oil Company, owned gas leaseholds in more than 315,000 acres of land

in the Texas Panhandle Field; Cities Service Company, through its wholly owned subsidiary, Public Service Company, at Denver, Colorado, and its wholly owned subsidiary, Pueblo Gas and Fuel Company, at Pueblo, Colorado, controlled the resale market for gas in the two cities, but did not have an adequate supply of natural gas or pipeline facilities for the transportation of natural gas to such cities. After extended negotiations, Southwestern, Cities Service, and Standard Oil Company of New Jersey, entered into an agreement denominated "Memorandum of Stipulations", and dated April 5, 1927. The primary objectives of the contracting parties, as expressed in the agreement, were the acquisition of natural gas properties in the gas field, the construction of a pipeline from the field to the City of Denver via Pueblo and Colorado Springs, the sale and delivery of natural gas at the city gate of Denver and other cities for distribution in such cities, and the supplying of natural gas to Colorado Fuel and Iron Corporation at Pueblo. Under the terms of the contract, Southwestern was to cause to be transferred to a new wholly owned subsidiary the leaseholds and gas producing properties, and to develop such properties into a source of supply of natural gas; Standard was to cause a corporation to be formed which would construct and maintain a natural gas pipeline and appurtenant facilities for the transmission and sale of gas; and Cities Service, through its subsidiaries, was to obtain franchises and rate ordinances in Denver and Pueblo, respectively, for the sale of natural gas, and convert the artificial gas distribution plants then in use in such cities into natural gas distribution plants. The newly formed subsidiary of Southwestern was to sell at cost gas to the pipeline company; and, with provisions for revision which need not be detailed, the pipeline company was to sell and make delivery at the city gate at the rate of forty cents per thousand cubic feet. The producing company and the pipeline company, and the pipeline company and the distributing companies, were to enter into contracts carrying out the commitments made in the Memorandum of Stipulations; and such contracts were to be for a term of twenty years from and after the execution of the first thereof, and as long thereafter as natural gas might be profitably sold by the pipeline company. The contract further provided that in case an ac-

ceptable rate ordinance should not be secured in the City of Denver, on or before July 1, 1927, the parties thereto, or any of them, might terminate participation therein, and each thereupon be free to act as though such stipulations and any agreements thereunder had never been made.

Franchises and rate ordinances were obtained in Denver and Pueblo; Canadian was incorporated as the subsidiary of Southwestern; and Standard caused Colorado to come into existence. Canadian and Colorado, Colorado and Public Service Company, and Colorado and Pueblo Gas and Fuel Company, respectively, entered into contracts as provided in the Memorandum of Stipulations; and by contractual arrangements, Colorado obligated itself to sell natural gas to the City of Colorado Springs for distribution by the city in its municipally owned distribution system and for sale to industrial and commercial consumers. Southwestern caused Amarillo Oil Company to convey the leases to Canadian. Canadian paid Amarillo Oil Company the sum of $5,000,000 for the leases and the then producing wells. Southwestern and Standard had agreed upon that amount, and it was paid with funds furnished by Standard. Canadian was financed through the issuance of bonds in the amount of $11,000,000, all of which were purchased by Colorado with funds furnished by Standard. Colorado issued 1,250,000 shares of common stock without par value, of which forty-two and one-half per cent was issued to Southwestern, forty-two and one-half per cent to Standard, and fifteen per cent to Cities Service; and it issued preferred stock valued at $2,000,000, one-half to Standard and one-half to Southwestern. Standard paid Colorado $1,000,000 in cash for the common stock issued to it and a like sum for its preferred stock. No cash consideration was paid for the stock issued to Southwestern or Cities Service. Colorado issued bonds in the amount of $19,200,000. These were sold to Standard for cash at par, and the proceeds, along with the cash which Standard paid for the stock issued by Colorado, aggregating $21,200,000, was used to finance the project. Canadian developed the leaseholds, and constructed a main transmission pipeline from the field to Clayton Junction in New Mexico, a distance of approximately 86 miles; and Colorado constructed a main transmission line from Clayton Junction to the city gate

at Denver, a distance approximating 254 miles, three compressors, and various laterals extending from the main line to customers of the company, including a lateral to the plant of Colorado Fuel and Iron Corporation. On December 31, 1939, Canadian had in operation a total of 94 gas wells; and its gathering system consists of about 144 miles of pipe, and has two terminals. One terminal is located at the Bivins Station where the gas there gathered is compressed and then transmitted through the transmission line to Clayton Junction where virtually all of it is sold to Colorado but a small amount is sold to Clayton Gas Company. The other terminal is located at Fritch Station where the gas there gathered is compressed and then transported through the facilities of Texoma Natural Gas Company to Gray Junction, in Oklahoma, where it is sold to Colorado. Colorado sells that gas to Natural Gas Pipeline Company, and it moves to its destination, known as the Chicago market.

The facilities of Wyoming consist of a main transmission pipe line extending from a point near Littleton, Colorado, to the city gate at Cheyenne, Wyoming, compressor stations, and a number of laterals extending from the main line to city gates and industrial plants in Colorado and Wyoming. From the inception of the project until the latter part of 1929, the company obtained its entire supply of natural gas from the Wellington Field in Colorado. But early in 1929, the supply from that field began diminishing rapidly; it became essential that the company secure another source in order to continue in business; in October of that year, it entered into a contract with Colorado for the purchase of gas from that company with which to supply its customers in the States of Colorado and Wyoming; and ever since Colorado has sold gas to Wyoming, deliveries being made at the point adjacent to Littleton.

In 1939, Canadian sold for resale approximately 46,000,000 Mcf of gas, of which about 41,000,000 Mcf were sold to Colorado; Colorado sold about 20,000,000 Mcf of such gas to Natural Gas Pipeline Company, about 7,000,000 Mcf to Colorado Fuel and Iron Corporation, and about 6,000,000 Mcf to Public Service Company; and Wyoming transported and sold 2,-860,000 Mcf some to affiliates for resale through distribution systems in towns and communities in Colorado and Wyoming, some to other companies for like distribution, some to industrial consumers, and some to United States Army posts.

■ *The Motions to Dismiss*—The City and County of Denver filed separate motions to dismiss the petitions for review of Canadian and Colorado, and Public Service Commission of Wyoming filed a like motion to dismiss the petition for review of Wyoming. We denied the motions, but thereafter the City and County filed a brief, and later its counsel participated in the oral argument, renewing the contention that the petitions should be dismissed for want of jurisdiction. The grounds of each motion are that it appears from the face of the petition for review that the petitioning company is a private corporation organized and existing under the laws of Delaware; that the petition fails to allege that the company is located in this circuit; and that it affirmatively appears from the face of the petition, the face of the record, the testimony of the company's own witnesses, and facts dehors the record that the company is not located and does not have its principal place of business in this circuit. These companies were incorporated under the laws of Delaware, and therefore their legal residence and domicile is in that state. Shaw v. Quincy Mining Co., 145 U.S. 444, 12 S.Ct. 935, 36 L.Ed. 768; Southern Pacific Co. v. Denton, 146 U.S. 202, 13 S.Ct. 44, 36 L.Ed. 942; Home Powder Co. v. Geis, 8 Cir., 204 F. 568; Continental Coal Corp. v. Roszelle Bros., 6 Cir., 242 F. 243; Dryden v. Ranger Refining & Pipe Line Co., 5 Cir., 280 F. 257, certiorari denied 260 U.S. 726, 43 S.Ct. 89, 67 L.Ed. 483; In re Hudson River Nav. Corp., 2 Cir., 59 F.2d 971.

■■ But section 19(b) of the Natural Gas Act, 52 Stat. 821, 15 U.S.C.A. § 717r (b), provides that any party to a proceeding under the act who is aggrieved by an order of the Commission made in the proceeding may obtain a review of the order in the Circuit Court of Appeals of any circuit in which the natural gas company to which the order relates is located or has its principal place of business, or in the Court of Appeals of the District of Columbia, by filing in such court within the time specified a petition in writing praying that the order be modified or set aside in whole or in part. It is to be noted that the statute provides in clear language that review may be had either in the cir-

cuit where the company is located or in the circuit where its principal place of business is located, the pivotal language being stated in the disjunctive. It is commonplace for a corporation chartered in one state to conduct much or all of its business in another state far distant from that of incorporation. No doubt mature considerations of convenience gave rise to the deliberate care with which Congress, in the exercise of its discretion, authorized review in the circuit within which the principal business of the company is conducted. And the principal place of business is where the actual business of the corporation is conducted or transacted. It is a question of fact to be determined in each particular case by taking into consideration such factors as the character of the corporation, its purposes, the kind of business in which it is engaged, and the situs of its operations. Cf. In re Guanacevi Tunnel Co., 2 Cir., 201 F. 316; In re Hudson River Nav. Corp., supra; Chicago Bank of Commerce v. Carter, 8 Cir., 61 F.2d 986.

■ Section 5 (2037), chapter 65, Revised Code of Delaware, provides that the certificate of incorporation shall set forth the name of the county, and the city, town, or place within the county, in which the principal office or place of business of the corporation is located in that state; and section 32 (2064) provides that every corporation shall maintain a principal office or place of business in the state. Here, in each instance, the certificate of incorporation states the location of the principal office of the company in Delaware, but it is completely silent in respect of the place of business. All of the physical properties and business operations of Colorado and Wyoming are located and conducted within this circuit. Wyoming maintains offices in Denver where its executive officers and agents supervise and administer its properties and operations. Canadian transports almost ninety per cent of the natural gas which it produces into this circuit, part into New Mexico and part into Oklahoma, where virtually all of it is sold to Colorado. The properties of Canadian and Colorado are operated as a unit. The two companies have a single general manager and jointly maintain an office in Colorado Springs, under the charge of such manager, where the supervision, direction, and management of the affairs of both companies are conducted. There are approximately thirty-six em-

ployees in the office, some devote their entire time to the business of Colorado and are paid by that company, some divide their time between the business of the two companies, and their salaries are paid partly by each company. The general manager is in charge of all operations of Canadian, including the gas fields and a field operating office in Texas; the chief dispatcher, who keeps in constant touch with the expected demands for gas and gives orders for the amount of gas to be piped, has his office in Colorado Springs and is under the supervision of the general manager. The principal books of account are kept in Colorado Springs, under the direction of the assistant treasurer of the company who maintains his office there. All major purchases for both companies are made and all bills for materials purchased are paid by vouchers issued out of the office there; all dealings between the two companies in connection with the purchase and sale of gas are conducted in and through the office there; and the principal bank account of Canadian is kept in banks in that city. We think it is clear that the principal place of business of each company is in this circuit, within the meaning of the statute. Continental Coal Corp. v. Roszelle Bros., supra; Dryden v. Ranger Refining & Pipe Line Co., supra; In re Lone Star Shipbuilding Co., 2 Cir., 6 F.2d 192. And we therefore adhere to the view that the motions to dismiss are illfounded.

■ *Jurisdiction of Production and Gathering Properties*—Canadian attacks the order relating to the reduction in its rates and charges on the ground that the Commission erroneously undertook to exercise unauthorized rate-regulatory jurisdiction over the production and gathering properties, facilities and business of the company. Section 1(a) of the Act, 15 U.S.C.A. § 717(a), supra, declares "that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation * * * relating to the transportation of natural gas and the sale thereof in interstate * * * commerce is necessary in the public interest." Section 1(b) limits the act in its application "to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, in-

952

dustrial, or any other use, and to natural-gas companies engaged in such transportation or sale", and further provides in express terms that it "shall not apply * * * to the production or gathering of natural gas." Section 2(6) provides that a natural gas company is a company engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale. Section 4(a) declares that rates and charges in connection with the transportation of natural gas subject to the jurisdiction of the Commission "shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful." Section 5(a) directs the Commission to "determine the just and reasonable rate * * * and shall fix the same by order." Section 6(a) empowers the Commission to "investigate and ascertain the actual legitimate cost of the property of every natural-gas company, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation and the fair value of such property." Section 7 vests in the Commission certain powers relating to the improvement, establishment of physical connections, abandonment, construction, or extension of transportation facilities of natural gas companies. Section 8 enables the Commission to require natural gas companies to keep and maintain accounts and records. Section 9 charts the authority of the Commission in relation to rates of depreciation and amortization of the several classes of property of natural gas companies. Section 10 concerns the filing with the Commission of periodic and special reports. Section 11 is addressed to the duties of the Commission respecting state compacts dealing with the conservation, production, transportation, or distribution of natural gas. And section 14(a) authorizes the Commission to "investigate any facts, conditions, practices, or matters which it may find necessary or proper in order to determine whether any person has violated or is about to violate any provision of this Act." The primary legislative purpose in the passage of the Act was to provide comprehensive regulation of the wholesale distribution to public service companies of natural gas moving interstate, and to vest in the Commission as the instrumentality of Congress power to exercise such regulation. Illinois Natural Gas Co. v. Central Illinois Public

Service Co., 314 U.S. 498, 62 S.Ct. 384, 86 L.Ed. 371; Public Utilities Commission v. United Fuel Gas Co., 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396. And the grant of powers expressly conferred upon the Commission carried with it by implication all authority reasonably necessary and fairly appropriate to make such powers fully efficacious, and to render effectual the discharge of the duties of the Commission. But, under section 1(b) the Commission does not have express or implied rate-regulatory jurisdiction of the production and gathering of gas.

■■ Canadian is engaged in the business of producing, gathering, transporting and selling interstate natural gas for resale for ultimate public consumption. It therefore is a natural gas company, subject to the jurisdiction of the Commission in respect to its rates and charges for the gas transported and sold in such commerce. Its production and gathering properties and facilities are parts of its integrated operations. Still, under section 1 of the Act they lie beyond the range of the rate-regulatory jurisdiction of the Commission. But the Commission did not prescribe charges for the production; did not fix rates for the gathering of gas; and did not exercise other rate-regulatory jurisdiction over production or gathering as such, within the meaning of the limiting and forbidding provisions of the Act. The Commission did not attempt to affect in any manner the acquiring and maintaining of gas leaseholds, gas rights, or gas wells. Neither did it undertake to affect anywise the location, construction, extension, or physical connections of pipelines, or the operation of pipelines or other facilities constituting the gathering properties. The rate-regulatory jurisdiction of the Commission was exerted only in respect of rates and charges for natural gas transported in interstate commerce and sold in such commerce for resale for ultimate public consumption. The Commission inquired into and considered the production and gathering properties in respect to cost, depreciation, operating expenses, and revenues. But the inquiry was merely in their relation to the fixing of reasonable rates to be exacted and received for the natural gas moved in interstate commerce and sold for resale. And the order of the Commission in each instance operated only upon such rates and charges. We fail to find in the act anything which

expressly or by fair implication indicates a Congressional purpose to restrict or withhold from the Commission jurisdiction in a case of this kind to take into consideration the production and gathering properties only as they have bearing upon the question of the fixing of reasonable rates for gas moved interstate and sold for public consumption.

 *Abrogation of Prices Fixed by Contract Prior to Effective Date of the Act*—While not challenging the constitutional validity of the Act on its face, or as it may be applied in general, Canadian and Colorado advance the contention that here the Commission erred in applying it retrospectively in such manner as to abrogate prices agreed upon in contracts of limited term entered into and substantially performed prior to the enactment of the Act, at a time when neither company was in fact or in law a utility or common carrier, and when each disclaimed all of the privileges and obligations as such. The contracts between Canadian and Colorado, Colorado and Public Service Company, Colorado and Pueblo Gas and Fuel Company, Colorado and the City of Colorado Springs, and Colorado and Wyoming, respectively, were each executed prior to the date on which the act became effective; they were of limited term; and they had been performed in substantial part at the time the Act went into effect. But at all times, the transportation and sale of natural gas in interstate commerce for wholesale distribution to public service companies or municipalities for resale to domestic consumers was subject to regulation by Congress. State of Missouri v. Kansas Natural Gas Co., 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027; Illinois Natural Gas Co. v. Central Illinois Public Service Co., supra; Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037; Public Utilities Commission v. United Fuel Gas Co., supra. And the exertion of the power of Congress in its regulation of interstate commerce is not fettered by pre-existing contracts or arrangements. The exercise of power under the Commerce Clause, Const. art. 1, § 8, cl. 3, cannot be subordinated to arrangements or stipulations previously effected. Contracts and arrangements of that kind necessarily are entered into with knowledge of the paramount authority of Congress to regulate commerce among the states. Union Bridge Co. v. United

States, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523; Monongahela Bridge Co. v. United States, 216 U.S. 177, 30 S.Ct. 356, 54 L.Ed. 435; Philadelphia Co. v. Stimson, 223 U. S. 605, 32 S.Ct. 340, 56 L.Ed. 570; Philadelphia, B. & W. R. Co. v. Schubert, 224 U.S. 603, 32 S.Ct. 589, 56 L.Ed. 911; Greenleaf Johnson Lumber Co. v. Garrison, 237 U.S. 251, 35 S.Ct. 551, 59 L.Ed. 939; Continental Ins. Co. v. United States, 259 U.S. 156, 42 S.Ct. 540, 66 L.Ed. 871; Sproles v. Binford, 286 U.S. 374, 52 S.Ct. 581, 76 L.Ed. 1167; Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406.

 It is emphasized that at the time the contracts were entered into neither of these companies was in fact or in law a public utility or common carrier, and that each disclaimed all of the privileges and obligations as such. These companies have never sought or acquired any certificate of public convenience and necessity, any franchise, or any right to enter a municipality; they have never advertised or represented that they would sell gas to the public generally; and they have never filed any rate schedule with any regulatory commission or any other authority. At the time the Act became effective, and since, Canadian transported and sold interstate gas to Colorado, and also made sales for resale to a distributing company; and Colorado made sales for resale to one municipality, four or five distributing companies, and two pipelines, and made direct sales to five industrial customers, under private contracts respecting price, quantity, time of delivery, and so forth. But freedom of contract does not place it within the power of companies engaged in business of that kind to restrict or withhold from the control of Congress at a later time so much of the field of regulation of interstate commerce as they choose to bring within the range of their arrangements. Even though executed prior to the enactment of the Act, contracts of that nature are subject to regulation in the public interest. Cf. Mississippi River Fuel Corp. v. Federal Power Commission, 8 Cir., 121 F.2d 159.

 The companies made large investments on the strength of the contracts but that is not decisive, as in the very nature of things they were made subject to the exercise of the paramount authority of

954

regulation. Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co., supra.

*Requiring the Impossible of Canadian*—Canadian attacks the order relating to its rates and charges on the further score that it requires the company to do the impossible, and violates due process. Const.Amend. 5. The contract between Canadian and Colorado requires Canadian to develop, operate, and maintain its properties with diligence, so as to produce sufficient natural gas to meet the requirements of Colorado; to sell the gas to Colorado at cost; to make no contract for the sale of gas that might impair its capacity to produce gas for delivery to Colorado; to credit Colorado with all revenues, income, or profits which it may receive from any other source; and to disburse funds received from any source only in the discharge of its obligations under the contract with Colorado and any other contracts permitted under its provisions, and in payment of principal and interest on its outstanding indebtedness. It is argued that the contract forecloses any possibility of profit to Canadian and therefore the order exacts the impossible and is confiscatory. The power to regulate commerce is subject to the limitations and guarantees of the Constitution. Monongahela Nav. Co. v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463; United States v. Chicago, M., St. P. & P. R. Co., 282 U.S. 311, 51 S. Ct. 159, 75 L.Ed. 359. But permissible regulation of rates does not insure that the business shall produce net revenues, and any rate may be decreased which is not the lowest reasonable rate. Federal Power Commission v. Natural Gas Pipeline Co., supra.

This contention in its entirety proceeds upon the premise that since Canadian under the contract sells gas to Colorado at cost, there is no possibility of profit accruing to Canadian. But apparently the argument fails to give consideration to the fact that in connection with the contract under which Canadian furnishes and Colorado accepts the gas, Canadian received initially $5,000,000 in cash from Standard; that Colorado without cash consideration issued to Southwestern forty-two and one-half per cent of all its common stock, and preferred stock of the value of $1,000,000; that Southwestern shares on that basis in the beneficial ownership of Colorado and in its net earnings from time to time; and that in view of the relation existing between Southwestern and Canadian, Canadian in effect shares accordingly. Taking these and other factors into account, there is no basis for challenging the order on the ground that it exacts the impossible and is confiscatory.

*The Sufficiency of the Evidence to Support the Finding of Unreasonableness of Rates and Charges*—The finding of the Commission that the rates and charges of the companies were unjust and unreasonable is questioned for want of substantial evidence to support it. The passage of the Act did not automatically overthrow the contracts into which these companies had previously entered. Neither did it ipso facto set aside the schedules of charges upon which they had agreed. Such rates and charges could be modified only after an express finding of unreasonableness. Wichita R. & Light Co. v. Public Utilities Commission, 260 U.S. 48, 43 S.Ct. 51, 67 L.Ed. 124; Allen W. Hinkel Dry Goods Co. v. Wichison Industrial Gas Co., 10 Cir., 64 F.2d 881. And the right of the Commission to make a finding of unreasonableness depends upon the existence of the fact. In the absence of substantial evidence to show that the rates and charges in existence are unreasonable, a finding to that effect constitutes the arbitrary exercise of power by administrative fiat and cannot stand. Interstate Commerce Commission v. Louisville & N. R. Co., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431.

But a finding of unreasonableness made after a full hearing carries with it a presumption of correctness, and the burden rests upon him who attacks it on review for want of substantial evidence to show the absence of such evidence. An extended analysis of the voluminous evidence would not serve any useful purpose as no two cases of this kind are alike in point of fact. We are content to say that a careful examination of the entire record convinces us that the finding is supported by substantial evidence, and therefore under section 19(b) of the Act, it is conclusive.

*The Question of Value*—Coming to the question of the rate base, Canadian and Colorado each submitted evidence tending to show reproduction cost new, less observed depreciation, and they also submitted evidence as to the original cost of the property. Wyoming introduced evidence as to actual construction cost, less

observed depreciation, plus working capital and additions to plant. The evidence of the Commission staff was restricted to original cost. After considering the estimates of reproduction cost new, less observed depreciation, the Commission concluded that they were too conjectural to have probative value, as they were not based upon established facts, but were subject to the vagaries of theories and imagination. Turning to the evidence of original cost, the Commission found that the properties were all of comparatively recent acquisition or construction; that the accounting records had been sufficiently adequate and well maintained to permit a ready determination of all costs involved; that the major portion of all cost of Canadian and Colorado had been incurred since the adoption by such companies of an accounting system based on the Code of Accounts of the Public Service Commission of Pennsylvania; that the basic facts were clear and essentially undisputed; that they represented the best and only reliable evidence respecting property values; and that, in accordance with section 6 of the act, supra, and under the record in the proceeding, no necessity existed to consider other factors than original cost. The Commission then determined original cost as of December 31, 1939, deducted a sum representing accrued depreciation, depletion, and amortization, added an amount for working capital and additions to plant, and in the case of Wyoming made a deduction for customer contributions. The amount reached by that method of computation, denominated by the Commission as prudent investment, was adopted as the rate base. The companies contend that the rate base should have been grounded upon present fair value. It must be conceded that the contention finds support in many cases holding that while actual cost, cost of reproduction new, and other elements affecting value should be taken into account and given their proper weight, the final basis of calculation in the regulation of rates of a public utility is a fair return upon the present fair value of the property used for the convenience of the public. Smyth v. Ames, 169 U.S. 466, 546, 18 S.Ct. 418, 42 L.Ed. 819; San Diego Land & Town Co. v. City of National City, 174 U.S. 739, 757, 19 S.Ct. 804, 43 L.Ed. 1154; San Diego Land & Town Co. v. Jasper, 189 U.S. 439, 442, 23 S.Ct. 571, 47 L.Ed. 892; Willcox v. Consolidated Gas Co., 212 U.S.

19, 41, 29 S.Ct. 192, 53 L.Ed. 382, 48 L.R.A.,N.S., 1134, 15 Ann.Cas. 1034; The Minnesota Rate Cases (Simpson v. Shepard), 230 U.S. 352, 434, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann. Cas.1916A, 18; Southwestern Bell Tel. Co. v. Public Service Commission, 262 U. S. 276, 287, 43 S.Ct. 544, 67 L.Ed. 981, 31 A.L.R. 807; Bluefield Water Works & Improvement Co. v. Public Service Commission, 262 U.S. 679, 690, 43 S.Ct. 675, 67 L.Ed. 1176; Board of Public Utility Com'rs v. New York Tel. Co., 271 U.S. 23, 31, 46 S.Ct. 363, 70 L.Ed. 808; McCardle v. Indianapolis Water Co., 272 U.S. 400, 410, 47 S.Ct. 144, 71 L.Ed. 316; St. Louis & O'Fallon R. Co. v. United States, 279 U.S. 461, 484, 49 S.Ct. 384, 73 L.Ed. 798; Los Angeles Gas & Electric Corp. v. Railroad Commission, 289 U.S. 287, 305, 53 S.Ct. 637, 77 L.Ed. 1180.

But the late case of Federal Power Commission v. Natural Gas Pipeline Co., supra involved an order of the Commission reducing the rates of two companies engaged in business as a single enterprise in the production and transportation interstate of natural gas for sale at wholesale to public utilities, and the court there held that the "Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end." And the later case of Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 287, similarly involved an order of the Commission requiring a reduction in rates of a company engaged in the business of producing, purchasing, transporting and selling at the state line natural gas for continuous movement and ultimate distribution in other states. There the rate base adopted by the Commission was substantially identical with that here; and there, as here, it was attacked on the ground that present fair value is the only

permissible rate base. But the court rejected the contention and upheld the order. In doing so, the court said that, "Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. * * * It is not the theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important." These two cases are controlling. And guided by them, it is clear that neither of these orders is to be invalidated for failure of the Commission to use present fair value at the rate base, unless in its totality it oversteps the limits of due process.

■ *Disallowances in Arriving at Original Cost*—In arriving at the original cost of the properties, the Commission eliminated certain items appearing on the books of the companies. Canadian paid to Amarillo Oil Company the sum of $5,000,000 in cash for the leaseholds. Their original cost to Amarillo Oil Company was only $1,879,504. Since Canadian and Amarillo were wholly owned subsidiaries of Southwestern, the Commission eliminated $3,120,496, representing the difference between the cost to Amarillo Oil Company and the amount which Canadian paid. By the Memorandum of Stipulations, Southwestern, the parent of Canadian and Amarillo Oil Company, obligated itself to cause the leaseholds to be devoted to the proposed project. Disregarding the fiction of separate corporate entity, and looking to substance, the contention that the leaseholds should be included at the figure which Canadian paid Amarillo Oil Company rather than the original cost to Amarillo Oil Company amounts in substance to receiving a return on $5,000,000 for property which actually cost less than $2,000,000. There is no proper place in the field of rate-making for synthetic inflation of that kind. *Pennsylvania Power & Light Co. v. Federal Power Commission,* 3 Cir., 139 F.2d 445.

■ As to Colorado, the Commission eliminated $2,352,940, representing the recorded value of stock payments made to Southwestern and Cities Service for entering into contracts for the sale and purchase of gas. By the Memorandum of Stipulations, Southwestern was obligated to re-quire its subsidiary, Canadian, to enter into a contract to sell gas to Colorado, and Cities Service was similarly obligated to require its subsidiaries, Public Service Company and Pueblo Gas and Fuel Company, each, to enter into a contract for the purchase of gas from Colorado. But, according to the records of Colorado, Canadian refused to enter into the contract for the sale of gas to Colorado, and Cities Service refused to direct or permit its subsidiaries to enter into the contracts for the purchase of gas from Colorado; and thereupon Colorado issued to Southwestern as the nominee of Canadian 10,000 shares of preferred and 531,250 shares of common stock, and issued to Cities Service 187,500 shares of common stock. The resolution of the Board of Directors of Colorado authorizing the issuance of such stock recited that the stock first described be issued as part of the consideration for Canadian entering into the contract, and the stock last described be issued in consideration of Cities Service directing its subsidiaries to enter into contracts. The record offers little or no explanation of the refusal to enter into the contracts as provided with binding effect in the Memorandum of Stipulation, or of the failure of Colorado to exact that they be entered into without additional consideration or inducement. Though the reasons may have been satisfactory to the parties in interest, it is manifest that the legitimate cost of Colorado's property for rate-base purposes could not be swelled by the issuance of stock in circumstances of that kind. Cf. *Northwestern Electric Co. v. Federal Power Commission,* 321 U.S. 119, 64 S.Ct. 451.

■ As to Wyoming, the Commission rejected $82,792.57, representing sums paid to Henry L. Doherty & Company for engineers fees. Wyoming and the Doherty Company maintained a contractual arrangement under which the Doherty Company placed at the service of Wyoming its combined experience, advice, and assistance in solving such problems as might arise in connection with the conduct of the business of Wyoming. The tendered advice and assistance related to numerous services, including designing and construction engineering, and fixed the compensation for each, including an engineering fee equal to five per cent of the cost of construction. An affiliate relationship existed between the two companies; Wyoming was unable on request to furnish

the Commission any showing that any cost had been incurred in connection with the rendering of engineering services; and there was testimony that the books and records of Wyoming failed to contain any indication that the fees represented any actual cost of services for which the amount was paid. In short, there was no showing satisfactory to the Commission that any engineering services were rendered. The general rule in rate-making against profits in connection with transactions between affiliates warranted the Commission in eliminating the item. Cf. Pennsylvania Power & Light Co. v. Federal Power Commission, supra.

 The Commission eliminated from the capital account of Canadian the sum of $129,032, being expenditures previously charged to current operating expense but now sought to be capitalized; it made a like deduction of $440,050 from the account of Colorado; and that action is challenged. In each instance the company added or sought to add the amount in arriving at its claimed original cost. The amount represented reaccounting rather than the correction of accounting, for the charges were made to operating expense in conformity with the established accounting policy of the company in effect at the time, and they were never considered capital investment until the Commission began its investigation. In respect of many expenditures there is at best an indistinct line of demarcation between operating costs and capital costs. It often is difficult to blueprint a clear distinction between expenditures made for operation and maintenance and those made for construction. And therefore a natural gas company, as defined by the Act, must be allowed to exercise a measure of discretion in making its determination between the two. But a method, reasonably acceptable to good accounting, must be adopted and adhered to consistently. Consistent principles and practices of accounting must be followed. Change cannot be made at will. These companies deliberately exercised their discretion in charging these expenditures to expense; Canadian has fully recovered from Colorado its expense now sought to be capitalized; and Colorado has treated its expenditures now in question as necessary operating expense to be deducted from earnings before arriving at net profits. The Commission was well within the ambit of its authority in mak-

ing the deductions on the ground that it would do violence to recognized principles of equity to permit these companies at this late hour to shift their position and treat retroactively these items as capital investment upon which they are entitled to receive return. Cf. Federal Power Commission v. Natural Gas Pipeline Co., supra; Northwestern Electric Co. v. Federal Power Commission, 9 Cir., 125 F.2d 882, affirmed 321 U.S. 119, 64 S.Ct. 451; City of Wheeling v. Natural Gas Co., W.Va., 175 S.E. 339; Peoples Gas Light & Coke Co. v. Slattery, 373 Ill. 31, 25 N.E.2d 482.

 The Commission made a deduction of $366,507 from the original cost claimed by Canadian for interest during construction, and that action is challenged. Canadian recorded on its books a charge for interest during construction, computed on the basis of a construction period beginning May 1, 1927, and ending October 31, 1928, and including the full amount which Canadian paid Amarillo Oil Company for the leaseholds. The Commission found that regular deliveries of gas commenced the latter part of June, 1928, and continued thereafter. The Commission determined that the construction period ended July 1, 1928, and disallowed interest after that date. The books of Wyoming showed the capitalization of interest during construction. The amount included interest in relation to main line constructed and in relation to lateral construction. The Commission disallowed the claim in part on the ground that it represented interest computed on a proportion of the total cost of the property, estimated by the company to be in excess of that required to handle the business actually done during the period. The Commission characterized the claim as the capitalization of a fictitious and arbitrary amount after the close of the construction period, and stated that interest ceases to be a cost of the original plant when commercial operations begin. These companies were not entitled to interest after the construction period ended and they began to receive earnings. Alabama Power Co. v. McNinch, 68 App.D.C. 132, 94 F.2d 601.

 Elaboration is unnecessary concerning the disallowance of interest on the amount which Canadian paid Amarillo Oil Company for the leaseholds in excess of the original cost to Amarillo Oil Company. We have previously said that, due to the affiliate relation between Canadian and Amarillo Oil Company, the Commis-

sion in arriving at the original cost providently included the property at the amount of the original cost to Amarillo Oil Company. That being its cost for rate-base purposes, it follows that interest on the excess could not be included in the rate base.

■■ *The Claim for Going Concern Value*—Wyoming claimed an allowance for going concern value as part of its rate base. In rejecting the claim and failing to make any allowance for that element, the Commission found that the amount claimed represented a judgment figure wholly unrelated to any costs or outlays, and was therefore deemed unjustified. It is well settled "that there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced" and that such "element of value is a property right, and should be considered in determining the value of the property, upon which the owner has a right to make a fair return when the same is privately owned although dedicated to public use." Des Moines Gas Co. v. City of Des Moines, 238 U.S. 153, 165, 35 S.Ct. 811, 815, 59 L.Ed. 1244; City and County of Denver v. Denver Union Water Co., 246 U.S. 178, 191, 192, 38 S.Ct. 278, 62 L.Ed. 649; McCardle v. Indianapolis Water Co., supra; Los Angeles Gas & Electric Corp. v. Railroad Commission, supra. But even though it is an element for appropriate inclusion in the rate base, there is no constitutional exaction that it be separately stated as such and added to cost figures attributable to the physical properties. Columbus Gas & Fuel Co. v. Public Utilities Commission, 292 U.S. 398, 411, 54 S.Ct. 763, 78 L.Ed. 1327, 91 A.L.R. 1403; Denver Stock Yard Co. v. United States, 304 U.S. 470, 479, 58 S.Ct. 990, 82 L.Ed. 1469; Driscoll v. Edison Light & Power Co., 307 U.S. 104, 59 S.Ct. 715, 83 L.Ed. 1134; Federal Power Commission v. Natural Gas Pipeline Co., supra. The requirement may be satisfied if a reasonable allowance is "reflected in the other items and particularly in the appraisal of the physical assets as part of an assembled whole." Columbus Gas & Fuel Co. v. Public Utilities Commission, supra [292 U.S. 398, 54 S.Ct. 769, 78 L.Ed. 1327, 91 A.L.R. 1403].

■ The amount claimed by the company was $175,000. A valuation engineer residing in New Jersey testified in support of the claim. He stated that he did not employ any mathematical formula in arriving at his conclusion as to amount, and he admitted that it was only a judgment figure. He stated with commendable candor that he reached it "just as a horse-trader looks at a horse and decides what it is worth". The record fails to indicate affirmatively whether the element was indirectly reflected to any extent in other items and in the appraisal of other properties as part of the assembled whole. But in any event, there is no basis on which to rest the conclusion that the failure of the Commission to state separately and add an amount as going concern value overstepped the limits of due process.

*Allocation of Cost of Service*—The orders are assailed for failure of the Commission to make a separation or allocation of the property used in regulated business from that used in unregulated business. Under section 1 of the Act, natural gas moved in interstate commerce and sold for ultimate distribution to the public is subject to regulation by the Commission, but gas transported in interstate commerce and not sold for such distribution as well as gas sold intrastate is not subject to regulation. Each of these companies is engaged in both kinds of business. The Commission expressed its awareness of the necessity of determining the reasonableness or unreasonableness of the rates and charges subject to its jurisdiction, observed that this required the distribution of the total costs of operations, including depreciation, taxes, and a fair return, among the various customers served, individually or by appropriate groups, and commented that to the extent that such costs allocated to sales under the jurisdiction of the Commission were less than revenues received, the rates and charges made were unjust and unreasonable, and revenues must be reduced accordingly. The Commission further stated that it did not follow from that obligation that an allocation of physical property or portions thereof must be made before any excessive returns were determined. After observing that nowhere in all the evidence submitted by Canadian and Colorado was there a complete presentation of the entire operations, broken down between jurisdictional and nonjurisdictional operations, the Commission determined that all which could be accomplished by an allocation of physical properties could be attained by allocating costs including the return. And the Com-

mission added that such method was by far the most practical and business-like. Following these observations, statements, and findings, the Commission made the allocation as to each company.

■ Where, as here, a natural gas company is engaged in an integrated business, part of which is subject to regulation and part of which lies beyond the reach of the regulatory jurisdiction of the Commission, some separation of the property, capital, and revenue is essential in order that regulation may be confined to its permitted field. The separation may be appropriately effected by estimating or appraising the value of the property used in the regulated business and that used in the unregulated business. Smith v. Illinois Bell Tel. Co., 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255. But that method in its completeness is not always exclusive of others. The separation or allocation may be effected by application of any formula which makes the principle a working one suitably adapted to the particular circumstances. Columbus Gas & Fuel Co. v. Public Utilities Commission, supra.

■ The integrated properties of these companies were designed and are being used in making both direct sales and resales. The companies rely on the same transmission and other facilities in serving both classes of customers, and both classes of customers jointly share the benefit of the same facilities and gas supply. In these particular circumstances, an allocation of the cost of supplying gas service to customers cannot be said to be a fatally inappropriate or infirm means of effectuating a separateness of the property and capital used in the integrated business.

■ But, assuming that the requisite separation may be accomplished by an allocation of cost of service, the method used by the Commission is said to be erroneous. It is argued among other things that it assumes that all of the property is used in common in the conduct of all business, whereas a large portion is used exclusively in the regulated portion, another part is used exclusively in the unregulated portion, and only a part is used in common in both businesses; that in respect to the property which is used in common for both businesses, it fails to give consideration to the priority or preferential use of such property in supplying gas for domestic consumption as against unregulated business, and ignores actual peak demands and load factors; that it operates to minimize all costs, produces apparent cost much less than actual cost, and shifts cost from regulated to unregulated business; and that it is unsound both in fact and law. It may be conceded, without deciding, that the method is not free from defects or imperfections in all its aspects. But even so it cannot be said that as the consequence, the impact of the orders of reduction, each in its totality, produces arbitrary results or oversteps the bounds of due process. Therefore the orders are not open to further judicial inquiry on these grounds. Federal Power Commission v. Natural Gas Pipeline Co., supra; Federal Power Commission v. Hope Natural Gas Co., supra.

*Depletion, Depreciation and Amortization*—The companies introduced evidence relating to accrued depreciation. It was based upon observed per cent condition of the property. Accrued depletion as determined by Canadian was based on estimates of original and remaining gas reserves. The evidence of the staff of the Commission treated accrued and annual allowances for depreciation on the basis of the application of the service-life principle. The Commission observed that if the theory of observed per cent condition of the property were carried out consistently, it might be considered as having some elements of reasonableness; that the small observed depreciation would find its counterpart in an equivalently small annual charge to operating expenses to cover the yearly added amount of observed depreciation; that this was not done in the estimates submitted by these companies; that, instead, in calculating expenses chargeable to the consumer high depreciation charges were computed, and in computing return to the company a small deduction from the cost of plant was computed. And after full consideration, the Commission adopted the service-life principle for determining annual and accrued depreciation and the production method for determining annual and accrued depletion of production facilities.

■ Section 6 of the Act empowers the Commission to determine the depreciation in property used by a natural gas company, but it fails to prescribe the method to be used in the discharge of that function. Depreciation represents the loss, not restored by current maintenance, causing the ultimate retirement of the property. The factors entering into it usually are wear and tear, decay, inadequacy, and obsolescence. And in determining reasonable

rates to be charged by a public utility, it is proper to include in the operating expenses an allowance for consumption of capital in order that the integrity of the investment in the service may be maintained. Lindheimer v. Illinois Bell Tel. Co., 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182.

As we understand, the Commission in arriving at accrued depreciation determined the amount to be deducted from original cost on the age-life basis by applying the straight life service method to the property. The contention that the testimony of valuation engineers who examined the property and made estimates in respect of its condition should have been accepted in preference to calculations based on averages and assumptions finds its genesis in Pacific Gas & Electric Co. v. City and County of San Francisco, 265 U. S. 403, 44 S.Ct. 537, 68 L.Ed. 1075, and McCardle v. Indianapolis Water Co., supra. But there is no basis in this record on which it can be concluded that the determination of depreciation in the manner adopted by the Commission will result in any of these orders in its entirety causing a failure to restore the capital investment at the end of the term, and therefore no deprivation of property is involved. Once more, in the absence of impingement upon due process, review is ended. Federal Power Commission v. Natural Gas Pipeline Co., supra; Federal Power Commission v. Hope Natural Gas Co., supra.

*Gas Reserves*—In connection with its determination of annual allowances for depreciation and depletion, the Commission found that Canadian's remaining recoverable gas reserves as of December 31, 1939, were not less than 2,800,000,000 Mcf at 14.65 pounds pressure base and an abandonment pressure of approximately 50 pounds; and that at the then present and expected future rate of production of about 55,000,000 Mcf per year, such reserves would last 53 years. The finding is characterized as arbitrary, capricious, and without any basis in the record. It is said that the reserves were much less in amount and that as a source of supply for long distance pipe lines they will not extend in width beyond 1956. The field is about 125 miles long and varies from 10 to 40 miles. It comprises approximately 1,-500,000 acres, of which about 1,000,000 acres produce sweet gas, and some 500,000 acres produce sour gas. Oil is produced in a portion of the field. Natural gas was discovered in 1918, on acreage now owned

by Canadian; and at the time of the hearings in these proceedings there were about 1650 wells producing gas only, and about 4200 wells producing both oil and gas.

The two methods most frequently used in estimating recoverable gas reserves are the rock pressure decline method and the sand thickness porosity method. Using the pressure decline method, an experienced geologist and petroleum engineer on the staff of the Commission testified at length. He estimated that the reserves for the entire field were 22,420,000,000 Mcf, and that those of Canadian were 3,645,213,000 Mcf. For the purpose of determining the true average or equilibrium pressure prevailing throughout the field, he divided the field into areas of comparatively equal pressures, called quadrants, and made an estimate for each quadrant. His estimate in the aggregate was the sum of his estimates for the several quadrants. A scientific article published in 1933 was introduced in evidence in which the recoverable reserves in the field were estimated to be 16,100,000,000 Mcf. Two qualified experts testified for Canadian. One used the sand thickness porosity method, and he estimated that the reserves in the field amounted to 9,532,027,596. The other used the open flow method which is a variation of the sand thickness porosity method, and his estimate of the field was 8,840,132,111 Mcf. And there was much other evidence having bearing upon the question. The Commission found itself unable to accept in toto any of the estimates. The Commission observed that the pressure decline method is recognized as a satisfactory method of estimating gas reserves in fields that are depleted as much as fifteen per cent or more and where reliable pressure and production data are available; that the Texas Panhandle Field met these qualifications; that it was a well developed field; and that the pressure and production records maintained by the Railroad Commission of that state were adequate and satisfactory. The Commission found that the pressure decline method was to be desired over the methods used by the witnesses for the company; that the estimates of the witnesses for the company were not founded on proper data and must be considered essentially unreliable; that if the method of averaging quadrants was incorrect, it favored the company position of lower reserves; that the acreage of the company was among the very best in the entire field; and that after weighing all

pertinent facts of record and making due allowance for the criticisms of the estimate submitted by the Commission staff, the recoverable reserves were found to be not less than 2,800,000,000 Mcf of gas.

 The rock pressure decline method of estimating recoverable reserves of natural gas is not only accepted practice among mining engineers but it has been accorded judicial recognition. Dayton Power & Light Co. v. Public Utilities Commission, 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267. It lay within the discretion of the Commission to select that method as the most satisfactory and reliable means of determining the reserves of Canadian. And the Commission was not required to accept at face value the opinion evidence of the witnesses who testified as experts in respect to volume. The weight to be given to their evidence was a matter for the appraisal and judgment of the Commission, in the light of the circumstances. Existing volume, pressure differentials and consequent drainage, and other recovery factors should be given consideration in arriving at a final conclusion concerning the reserves. But it nowhere appears that the Commission failed appropriately to weigh these elements.

 As has already been said, section 19(b) of the Act provides that a finding of fact made by the Commission shall be conclusive on review if it is supported by substantial evidence. Congress thus committed to the Commission the function of weighing evidence, drawing inferences from the facts and circumstances established, and choosing between conflicting inferences. And a court is not free to substitute its view of the facts for that of the Commission. The underlying considerations which actuated Congress in vesting that power in the Commission are clear. The Commission often deals with subjects which are specialized, technical, and complex. It is relatively better staffed for its task than are the courts. And its members frequently bring to the discharge of their duties rich experience in those particular fields. The determination of the recoverable reserves of this company necessarily involved specialized and technical factors. The evidence relating to the question extends to great lengths. No useful end would be served by a detailed analysis of it. We think the finding is supported by substantial evidence and therefore is

not vulnerable to the charge of lacking basis in the record.

*Fair Rate of Return*—The evidence submitted by the companies relating to a fair annual return upon the rate base varied in amount from 8 per cent to 9.17 per cent, while that of the Commission staff was 6½ per cent. The Commission fixed 6½ per cent for all three companies. The Commission stated in that connection that there was no exact formula for determining a reasonable rate of return; that in the final analysis the rate must be the best judgment of the Commission, founded upon the evidence and guided by the basic facts required by law to be considered; that consideration must be given to the return earned by like investments which are attended by corresponding risks and uncertainties in the same vicinity over the same period of time; that Canadian had a long-term and essentially cost of service contract with its affiliate, Colorado; that the sales of Colorado and Wyoming were also principally to subsidiaries or affiliates and to stable markets; that Colorado's principal industrial sales were also to an affiliate—Colorado Fuel and Iron Corporation; and that all these facts materially reduced basic business risks that might be present under other circumstances.

 The rate of return which will constitute just compensation depends upon the circumstances. A public utility is entitled to such rates as will permit it to earn a return on the value of its property devoted to the convenience of the public substantially equal to that generally being earned in that area by other business enterprises which are attended by corresponding characteristics, including uncertainties, risks, hazards, and other elements affecting the operations. The return should be sufficient in amount to assure confidence in the financial soundness of the utility, and to enable it under efficient management to maintain its credit. Bluefield Water Works & Improvement Co. v. Public Service Commission, supra. But no formula can be laid down which will apply uniformly in all cases or to all kinds of utilities. That which is fair for one may be quite inadequate for another, depending upon differences in circumstances. And the ascertainment of a fair return in a given case is a matter incapable of exact mathematical demonstration. It is one of reasonable approximation having its basis in a proper

consideration of all relevant facts. Willcox v. Consolidated Gas Co., supra; United Railways & Electric Co. v. West, 280 U.S. 234, 50 S.Ct. 123, 74 L.Ed. 390.

 Making application of these principals, and taking into consideration the history of these companies, their relations and opportunities, their position for future financing, the stability of demand for their product, and other relevant factors, we think that a return of 6½ per cent on the rate base as fixed by the Commission is not so inadequate as to amount to confiscation. Federal Power Commission v. Natural Gas Pipeline Co., supra; Federal Power Commission v. Hope Natural Gas Co., supra.

 Finally, the Commission made allowances for working capital and additions to plant of all three companies, and these are attacked for insufficiency in amount; the Commission rejected some claims, and the companies predicate error on that action; and the Commission made certain adjustments, of which the companies complain. We do not discuss these seriatim. To do so would only extend this opinion, without adding anything of value to the accelerating accumulation of judicial utterances. The Commission was empowered to make pragmatic adjustments for which the particular circumstances call. Federal Power Commission v. Natural Gas Pipeline Co., supra. On the whole record, we are unable to say that any of these orders in its total effect produces any arbitrary result or does violence to due process. Therefore they must stand. Federal Power Commission v. Natural Gas Pipeline Co., supra; Federal Power Commission v. Hope Natural Gas Co., supra.

The orders are severally affirmed.