## COLORADO INTERSTATE GAS CO.
### v.
### FEDERAL POWER COMMISSION et al.
### No. 4541.

United States Court of Appeals
Tenth Circuit.
Oct. 29, 1953.
On Rehearing Jan. 25, 1954.

718

James L. White, and William A. Dougherty, New York City (John P. Akolt, Sr., John R. Turnquist, Denver, Colo., Charles E. McGee, Washington, D. C., and Lewis M. Poe, Colorado Springs, Colo., on the brief), for petitioner.

Jacob Goldberg, Washington, D. C. (Bradford Ross, Bernard A. Foster, Jr., William W. Gatchell, and Reuben Goldberg, Washington, D. C., on the brief), for respondent.

Before BRATTON, HUXMAN and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

Colorado Interstate Gas Company, herein referred to as Colorado, a natural

gas company under the Natural Gas Act, seeks review of the order of the Federal Power Commission, herein referred to as the Commission, entered under the appropriate provisions of the Act,[1] reducing Colorado's rate for natural gas sold in interstate commerce for resale. Nineteen hundred fifty-two was taken as the test period. Based upon Colorado's operations for that year, the Commission found and concluded that the rates established by Colorado in connection with interstate business were unjust, unreasonable and excessive and resulted in an unreasonable and excessive exaction from its customers in the sum of $3,111,187 and that new rates reflecting a reduction of such sum in such revenues would be just and reasonable. Such rates were ordered and this petition for review challenges the correctness and validity of such order.

In arriving at its conclusions, the Commission accepted for the test period of 1952 the total revenues of $19,104,052 as reflected by Colorado's books and as used by it in its exhibits in the case. Colorado's books reflected a total rate base of $57,200,440, while the Staff used a total rate base of $57,164,666, only $35,794 less than shown by Colorado's books. No issue is raised with respect to this slight difference and it may be disregarded. Colorado's revenues for the year 1952 in the total sum of $19,104,052 were accepted by the Staff and by the Commission. Colorado claims a total cost of service of $19,942,871, while the Staff adopted a cost of service base of $15,549,802. The Commission adopted a cost service base of $14,952,567, of which it allocated $10,273,474 to jurisdictional operations. It adopted 5¾% as a fair rate of return and fixed new rates which it concluded would return to Colorado from jurisdictional operations $10,289,269.

Colorado owns and operates extensive natural gas production gathering and processing facilities in the West Panhandle Field of Texas and also purchases and processes large volumes of natural gas in the Hugoton Field of Kansas. It also owns and operates a transmission pipeline system, extending from such fields to its general market area at Denver, Colorado. Sales are made from such pipelines to distributing facilities for resale and to industrial customers.

This proceeding was instituted on the Commission's own initiative. Extensive and numerous hearings were held. Hearings began on October 1, 1951, before a presiding examiner of the Commission and with intervening recesses were concluded on April 4, 1952. By order of May 23, 1952, the Commission dispensed with the filing of the intermediate opinion of the trial examiner. Briefs were thereafter filed with the Commission. Arguments of counsel were had and on August 8, 1952, the Commission issued its opinion with an accompanying order, directing a reduction of rates as above outlined.

Numerous assignments of error are urged by Colorado. Among others, it contends that dispensing with the filing of the trial examiner's intermediate report constitutes deprivation of due process and voids the order of the Commission. Since this contention, if sustained, would dispose of the case and make unnecessary a consideration of the remaining assignments of error, we consider it first.

5 U.S.C.A. § 1007(a) in part provides, "In cases in which the agency has not presided at the reception of the evidence, the officer who presided * * * shall initially decide the case or the agency shall require * * * the entire record to be certified to it for initial decision. Whenever such officers make the initial decision and in the absence of either an appeal to the agency or review upon motion of the agency within time provided by rule, such decision shall without further proceedings then become the decision of the agency. On appeal from or review of the initial decisions of such officers the agency shall, except as it

---

1. 15 U.S.C.A. §§ 717–717w.

may limit the issues upon notice or by rule, have all the powers which it would have in making the initial decision. Whenever the agency makes the initial decision without having presided at the reception of the evidence, such officers shall first recommend a decision except that in rule making or determining applications for initial licenses * * * (2) any such procedure may be omitted in any case in which the agency finds upon the record that due and timely execution of its functions imperatively and unavoidably so requires."

■ There are not many decided cases which have dealt with the power of the Commission to dispense with the trial examiner's initial report. In Kenny v. United States, D.C., 103 F.Supp. 971, 977, a three-judge court held that under the Interstate Commerce Act, 49 U.S. C.A. § 1 et seq., the exceptions embodied in Section 1007(a) (2) were intended to permit the omission of the intermediary report or tentative decision by a trial examiner where the law contemplated speedy and expeditious proceeding by the agency. While that case arose before the Interstate Commerce Commission under the Interstate Commerce Act pro·viding that the Commission "shall give to the hearing and decision * * * preference over all other questions", § 15(7), we think what was said applies with equal force and logic under the

Act in question here.[2] We think it is clear that Congress intended that party contestants before the Commission are as a matter of right entitled to the benefits of the intermediate report save only in the two exceptions noted in Section 1007(a) (2) but we are of the further view that under the exceptions as noted the Commission may in the exercise of a sound discretion either upon its own volition or upon the application of any party to the proceeding dispense with the filing of the report. In Footnote 3 we have set out some of the expressions in Congress. Appearing in the record, the reasons assigned by the Commission for its action in this respect are that there was good reason to believe that the rates being exacted were excessive; that an unjust exaction was being demanded from the gas users; that the case had been pending for three years and that it was to the benefit and interest of all that the matter be speedily adjudicated. These are cogent reasons supporting the action of the Commission under a statute vesting it with authority to dispense with the intermediate report in a case such as this.

Colorado, however, strenuously contends that there are present facts which stamp the action of the Commission as arbitrary and that by such action it was denied that due process to which it was entitled as a matter of law. It contends

2. See also Alabama-Tennessee Natural Gas Co. v. Federal Power Commission, 3 Cir., 203 F.2d 494.

3. With respect to this exception, Congressman Walter, one of the co-authors of the bill, explaining the exceptions stated that "the parties will be better served if the proposed decision * * * reflects the views of the responsible officers in the agencies, whether or not they have actually taken the evidence." Senate Docket No. 248, 79th Congress, Second Session, Page 361.

And the Senate Committee said, "The exemption of rule making and determining initial applications for licenses from provisions of Section 5(c), 7(c), and 8 (a) may require change if, in practice, it developes that they are too broad. Earlier in this report in commenting upon

some of those provisions, the Committee had expressed its reasons for the language used and had stated that, where cases present sharply contested issues of fact, agencies should not as a matter of good practice take advantage of the exemptions." Senate Docket No. 248, 79th Congress, Second Session, Page 216.

"There are, however, some instances of either kind of case (rule making and licensing) which tend to be accusatory in form and involve sharply controverted factual issues." Senate Docket No. 248, 79th Congress, Second Session, Page 262.

" * * * if issues of fact are sharply controverted, or the case or class of cases tends to become accusatory in nature * * *." Senate Docket No. 248, 79th Congress, Second Session, Page 273.

Like and similar statements appear in the reports of the Committees.

that the proceeding was adversary and accusatory in nature; that the issues of fact were sharply drawn and that there was conflict in the basic facts as well as an issue of the credibility of the witnesses; that the trial examiner who heard and saw the witnesses was best able to appraise and resolve this conflict in the evidence and, having seen the witnesses in the first instance, pass on their credibility, and that therefore dispensing with the examiner's report deprived it of his observations with respect to these matters, which he alone could make.

For support of this contention, Colorado relies in large part on what was said by the Supreme Court in Universal Camera Corporation v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. That case involved a charge of unfair labor practices under the Labor Act. The board rejected the examiner's findings and did not take them into consideration in its consideration of the case. This the Supreme Court said was error. But all the court held was that the trial examiner's report constituted evidence which should be considered along with all other facts and circumstances by the board in reaching its conclusion whether there was substantial evidence showing a violation. There was not involved the question under what conditions, if any, the examiner's report might be dispensed with. It is obvious that the issues arising in a labor board case, charging unfair labor practices, differ materially from those arising in a rate hearing case before the Federal Power Commission, such as we have here. In a labor board case the facts are always in sharp conflict and the credibility of witnesses many times involved.

█ To set out in detail the evidence which in our opinion warrants the conclusion that there was no disputed issue of fact would extend this opinion, which of necessity must be lengthy, to undue

length. We, therefore, content ourselves with saying that a careful analysis of the record does not in our view sustain the contention that there was any material conflict in the basic facts or that the credibility of witnesses was an issue. The facts with respect to the financial structure of Colorado, its gross revenue, as well as its expenditures, were all taken from the company's books. With slight variation the facts as revealed by Colorado's books were taken as the basic facts considered by the Commission in reaching its conclusions. The line of cleavage came with respect to the methods to be employed in allocating revenue and expenditures between jurisdictional and non-jurisdictional operations and the proper method by which to fix depletion, as well as other relevant matters. The difference between the parties involved difference of opinion and the inferences and deductions to be drawn from established basic facts. These issues arose in specialized fields calling for the opinion of experts. It was not a question of the credibility of the expert witnesses but rather a question of the weight to be accorded to their opinions. The Commission was as competent to pass on these questions without the examiner's intermediate report as with it because these questions were plainly within the Commission's expert competency.[4]

Colorado makes the further contention that the proceedings are fatally defective because it was not given the notice required by 5 U.S.C.A. § 1003(a). Its contention in this respect is that it was not notified or advised of the contention of the Commission's Staff. It points to the fact that the Staff introduced three cost of service studies relating to the years 1951, 1952 and 1953 and did not definitely state which one it stood on until after the hearings were closed.

██ But the notice to which Colorado was entitled prior to trial under Section 1003(a) was not of the position the Staff (the prosecuting agency) would

---

4. Gloyd v. Commissioner of Internal Revenue, 8 Cir., 63 F.2d 649, and cases there cited.

take at the hearing. Under Section 1003 (a) it was entitled to notice of "a description of the subjects and issues involved" in the proceeding and such notice it had. There was never any doubt as to the issues and matters involved in the hearing. Colorado, like the Staff, likewise introduced three alternative cost of service studies during the hearing. It is without dispute that Colorado's operations in 1952 were taken as the test period and that Colorado at all times knew of the contentions made with respect to such operations and had ample opportunity to meet them and prepare its case.

### Jurisdiction of the Commission and Scope of the Review.

Before going to a consideration of the substantive issues raised by Colorado, it might be well to set out the basic principles of law delineating the Commission's jurisdiction and our scope of review. The primary purpose of the Natural Gas Act was to protect the users of gas against exorbitant exactions at the hands of the natural gas companies and on the other hand assure to them the right of a fair return from their operations.[5] The duty and jurisdiction to effectuate these broad principles were lodged with the Commission. The Act provides that all rates shall be just and reasonable. It not only empowers but makes it the duty of the Commission, when necessary, to hold hearings to determine just and reasonable rates and fix the same by order. Any aggrieved party may petition the appropriate circuit court of appeals for review. Such court is vested with exclusive jurisdiction to affirm, modify, or set aside in whole or in part such order. But our scope of review is a limited one. The Act provides that "The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive."[6] In the Jersey City case, cited in Footnote 6, the Supreme Court quoted with approval from the Hope case, as follows:

" 'Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.' " It is in the light of these principles that we examine the entire record to determine whether the Commission's findings are supported by substantial evidence. If they are, we may not set them aside merely because we, as the triers of the facts, might reach different conclusions. We will consider the assignments of error in the order set forth in Colorado's brief. They are as follows:

### The Commission Failed to Make Adequate Findings Between Jurisdictional and Non-Jurisdictional Sales.

Under this heading Colorado contends that the Commission did not show an allocation of cost of service among petitioner's several classes of customers and did not make findings as to the determinants necessary for it to verify that it will be able to earn under the several rate schedules prescribed by the Commission the fair return allocated by the Commission. In the first place, Colorado does not contend that there is no evidence in the record that it will be able to earn the sum of $10,289,269 under the new rates fixed by the Commission. Table II of the Commission's opinion does show the allocation of the total cost of service broken down as to well mouth, gathering and products extraction, with

5. Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333.

6. Section 19(b); see also Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333; I. C. C. v. Jersey City, 322 U.S. 503, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420; Colorado Interstate Gas Co. v. Federal Power Commission, 10 Cir., 142 F.2d 943; Cities Service Gas Co. v. Federal Power Commission, 10 Cir., 155 F.2d 694.

respect to direct sales, total transmission, system, leased transmission facilities and other operations. Tables III, IV and V of the opinion show additional details as to such allocations. In the absence of any claim or showing that the revenues found by the Commission under its allocations will not accrue, Colorado may not complain because the cost of service is not further broken down.

Not much need be said with respect to the contention that no findings were made with respect to the determinants necessary for Colorado to verify that it will be able to earn under the several rate schedules the return allowed by the Commission. It seems to be conceded that both parties used billing demand and commodity value as determinants and that they were also used by the Commission. By the application of these two determinants to the rate schedules, the rate of return can be ascertained. It was, therefore, not necessary for the Commission to make specific findings with respect to these determinants, which admittedly were used by it as well as the parties to the litigation.

The substantive issues in conflict center around three items which must be considered in determining total cost of service. While the cost of service found by the Commission was $3,484,784 less than that found by Colorado, it challenges only $2,827,778 thereof. To resolve the issues in dispute, it is not necessary to make detailed computations of the items making up this amount. We do not understand that Colorado challenges the correctness of the computations if it be conceded that the treatment accorded these items by the Commission is correct. These three items are (a) loss, if any, from gasoline extraction, (b percentage depletion allowance, and (c) fair rate of return.

### Gasoline Operations.

Prior to this proceeding, Colorado sought and obtained permission to merge the properties of Canadian River Gas Company. Under the merger it was proposed to transfer from Canadian River to Southwestern Development Company, or its nominee, the liquid hydro-carbons in the gas production by Canadian River from the West Panhandle Field. Colorado was to continue to process the wet gas to remove the liquid hydro-carbons. Under this arrangement the revenues derived by Canadian River from the extraction and sale of natural gasoline, which had theretofore been used to reduce the cost of gas purchased by Colorado from Canadian River,[7] would be lost upon the consummation of the merger. The authorization for the merger was granted upon the express condition that whereas rights to liquid hydro-carbons in place were granted to the Southwestern Development Company and whereas Colorado was to receive 50% of the gross proceeds from the sale of certain liquid hydro-carbons and 15% of the net revenue was to be received by Colorado from the hydro-carbons resulting from the operation of Fritch Natural Gas Plant of Texoma Natural Gas Company, that if the cost properly allocable to such hydro-carbons exceeded the amounts payable to Colorado pursuant to such transactions then and in that case *in any proceeding in which the effective or proposed rates of Colorado are under inquiry such excess should not be considered as a cost of service to Colorado's natural gas customers and consumers.* The Commission determined that there was a loss from such operations and deducted the amount it found as the loss from the cost of service. Colorado on the other hand contends that there was a net profit from such operations. Whether there was a loss depends upon whether the methods of allocation of certain costs of operation adopted by the Commission were proper.

All parties recognized that since the liquid hydro-carbons are contained in the wet gas stream the cost of producing and gathering such wet stream to the inlet of the gasoline plants is a joint

7. See Colorado Interstate Gas Company v. Federal Power Commission, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206.

cost which must be allocated upon some reasonable basis between dry gas and gasoline. The Staff's method of relative market value was adopted by the Commission as a proper method of allocation. Under this method the joint costs were apportioned to the dry gas and gasoline on the basis of the relative market value of the finished products. The direct costs to make each product fully marketable were deducted from the respective market values of the finished products, so as to determine relative market values at the point of processing, where operations cease.

For the respective market value the Staff recommended and the Commission used 5 cents per Mcf as the value of dry gas, and as the value of gasoline the total gasoline revenue for 1952, as estimated by Colorado, less the direct cost to make the gasoline marketable, and other direct gasoline costs. The treatment to be accorded the costs within the plants will be discussed later in the opinion. Colorado on the other hand allocated the well mouth and gathering cost on what is termed a volumetric method, based on the shrinkage of the wet gas volume while being processed.

Colorado's contention that the Commission did not approve the relative value method as a proper method of allocation finds no support in the record. True, it did say that neither method was entirely satisfactory, but the same could be said with respect to any method which might be proposed. Mathematical exactness in the apportionment of cost is an impossibility. Because a method may have some infirmities does not of itself condemn it as a proper method.[8] It is the duty of the Commission to select that method which in its considered judgment more nearly reaches a just and sound result. The Commission did approve and apply the relative value method, and without extended discussion, we think its conclusion with respect

thereto finds support in the record and is, therefore, approved.

Colorado's contention that there is no evidence in the record supporting the Commission's valuation of 5 cents per Mcf for dry gas and, if that method were to be employed, that 10 cents should have been fixed as its value, is without merit. Without setting out the evidence in detail, it is sufficient to say that the evidence on which the Commission relied in fixing the value at 5 cents is at least as convincing, and perhaps more so, than the meager testimony of one witness on which Colorado relies to fix the value at 10 cents.

The more difficult question is whether the Commission correctly eliminated the loss from these gasoline operations from the cost of service. The gasoline operations were as much a part of Colorado's business as any other operation. Save for the provision in the merger order hereinbefore italicized, the total costs of the operation of this department would have of necessity been considered as a part of the total cost of service. The Commission seeks to justify its elimination of the loss from the cost of service under the provision in the merger order that such loss should not be taken into account in establishing new rates.

Throughout all the decisions runs the basic principle that the important and deciding factor in rate hearings is the end result. They emphasize that a reviewing court is more concerned with the end result than with the multiple detailed mechanics employed in reaching it. This was emphasized by us in Colorado Interstate Gas Company v. Federal Power Commission, 10 Cir., 142 F.2d 943, and in Colorado Interstate Gas Company v. Federal Power Commission, 324 U.S. 581, 603, 65 S.Ct. 829, 840, 89 L.Ed. 1206, where the Supreme Court again stated, "It is not the theory but the impact of the rate order which counts. If the total effect of the rate order cannot be

8. Colorado Interstate Gas Company v. Federal Power Commission, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206.

said to be unjust and unreasonable, judicial inquiry * * * is at an end." Conversely, if the total overall effect of the rate order is to deprive the utility of the opportunity to earn a fair return, it cannot stand.

It would seem that the elimination of the loss of the gasoline operations from the cost of service deprives Colorado of earning the fair rate of return to which it is entitled. It means that this loss must come out of the net profits of the stockholders notwithstanding that it is an element of cost of service. Nor is it an answer to say that this was a condition of the merger order and that, therefore, Colorado's stockholders are bound and saddled with this loss. We are dealing here with a business affected with a public interest. Parties in such businesses are not free to contract as they choose. They are subject to regulation by proper Governmental authority. In the exercise of its jurisdiction, such authority must be fair, both to the public and to the utility. It is the statutory duty of the Commission to establish on the one hand rates that are fair and just to the utility and on the other hand to strike down rates that demand an unlawful and unreasonable exaction. A rate based upon the exclusion from the cost of service, no matter for what reason, of a substantial amount of admitted operative cost does not and cannot reach a just end result and may, therefore, not stand.

The provision in the merger order that such operative costs as we are considering here should be eliminated from the cost of service base in subsequent rate hearings does not alter these basic principles. When that proceeding was before the Commission, it was its statutory duty to determine whether the plan was fair and just to Colorado's gas users. If it found that it might result in an unjust burden on them, it had power to disapprove it. It could not predicate its approval thereof upon a condition which it could not adopt in a rate hearing and which would thereafter deprive Colorado of the opportunity to earn a fair return upon its investment.

### Costs Within the Gasoline Plants.

The Commission did not adopt in whole the method championed either by its Staff or Colorado for allocating costs within the gasoline plants. In some respects it agreed with Colorado's contentions and made an allocation based thereon. In others it adopted a method proposed by its Staff. Since no issue is raised in the petition for review with respect to these allocations, we do not deem it necessary to further notice or discuss this element of allocation of joint costs.

### Percentage Depletion.

Under the Tax Code, a producer of natural gas is allowed an annual deduction for depletion of $27\frac{1}{2}\%$ of the well head value of the gas, not to exceed 50% of the net income. The treatment of this item is one of the major points of conflict in this case. It is, of course, obvious that the greater the amount of deduction for depletion the less remains of income on which to pay an income tax and correspondingly less will be the amount of the income tax which may then be included as an element of cost of service. The Commission fixed the value of the well head gas for this purpose at five cents per Mcf and then used that sum in determining the depletion allowance to be deducted from gross income for the purpose of computing income taxes. The income taxes so computed were then included as an element of the total cost of service. Colorado contends that the only proper value for this purpose was 3.17 cents. It asserts that the erroneous use of 5 cents per Mcf had the effect of increasing Colorado's percentage depletion deduction for federal income tax purposes by $938,449, which in turn had the effect of reducing the allowance of federal income taxes as an element of cost of service by $1,016,653.

Colorado's contention that the 3.17 cents is the only correct value which may be fixed on the gas at the well head is based on the fact that in 1946 the Bureau of Internal Revenue fixed this value on the gas for income tax computation purposes for Canadian River and that it has been thus used ever since. It argues with some force that if it is required to compute percentage depletion on a 5 cents valuation for rate fixing purposes and thus received a lower rate because of a greater depletion from the cost of service base and, when it then later files its income tax return is permitted to deduct depletion allowances on a value. of only 3.17 cents, its actual income taxes will be measurably higher than those computed in determining its rate base and that thus the rate so fixed will result in an unfair rate of return.

The Commission contends that Colorado is estopped to deny that 5 cents is the proper value to place on the well head gas by reason of the fact that in its application to the Commission for authority to merge with Canadian River it represented that a saving would be effected in federal income taxes by the fact that Colorado's depletion allowance would be based on a 5 cents value instead of 3.17 cents and that this representation was accepted by the Commission and was a factor inducing it to grant the merger order. Since we do not rest our decision on estoppel, it is not necessary to resolve this question.

We have already said there was substantial evidence supporting the Commission's finding of a 5 cent well head gas value. The question then is should it have surrendered its considered judgment with respect to this value and have adopted a value of 3.17 cents, because that was the value fixed in 1946 by the Internal Revenue Department for depletion allowances for Canadian River. To do so would in our opinion constitute an abdication and surrender of a duty placed upon the Commission by the Act. It could discharge its function of ascertaining a fair rate of return only by considering all relevant factors necessary for such a determination as of the time of the inquiry. This it is obvious included the present value of the well head gas for depletion purposes. In fixing this value, it was required to exercise its own judgment rather than fix a value merely because it had been adopted by another agency for another purpose and at another time.

Government is carried on through many more or less independent, although correlated, agencies which must work together toward a common objective. It can function efficiently and without injury to its citizens in many instances only if there is proper cooperation and recognition of inter-dependent relations between these various departments. It is not to be assumed in advance that the Internal Revenue Department will disregard a finding by the Commission in this respect without good cause and will arbitrarily adhere to a fixed depletion value for gas, adopted six years before, which will work serious injury to Colorado but, if so, and as pointed out by the Commission, it would then become a matter for future consideration. It is no reason to ask the Commission to not discharge its duty in finding the fair present marketable value of the gas in question.

### Rate of Return.

Colorado contended for a 6½% rate of return. The Commission fixed 5¾%. as a fair rate of return. If found that such a rate of return would produce a return for the common stock equity of Colorado of 8.45%, after allowing ½% for cost of financing, after servicing of Colorado's debt and preferred stock requirements and after allowing for all income taxes. From this the Commission concluded that such rate of return was wholly adequate to insure confidence in the financial soundness of the utility to maintain its credit and to enable it to attract capital necessary for the proper discharge of its public duties. The capi-

tal structure of Colorado considered by the Commission is set out in its opinion as follows:

| | Amount | Percent |
|---|---|---|
| "Long-term Debt | $29,600,000 | 53.9% |
| Preferred Stock | 2,000,000 | 3.6% |
| Common Equity | | |
| Common Stock | | |
| (1,711,016.6 shares) | $ 8,555,000 | |
| Surplus | 14,759,000 | |
| | $23,314,000 | 42.5% |
| | $54,914,00 | 100.0% |

The outstanding long-term debt of Colorado consists of four issues of long-term serial notes as follows:

2% Notes, due $400,000 semi-annually May 1, 1952 through May 1, 1954......... $ 1,200,000 [14]
2¾% Notes, due $400,000 semi-annually November 1, 1954 through November 1, 1964 ................................... 8,400,000
3⅛% Notes, due $250,000 semi-annually October 1, 1952 through April 1, 1969...... 8,000,000
3¾% Notes, due $400,000 semi-annually February 1, 1955 through August 1, 1969.. 12,000,000

[14] Excludes $800,000 of such notes due within one year included in current liabilities."

From this the Commission found that the weighted average cost of the debt was 3.25% for all of its outstanding long term debt; that the preferred stock bore a dividend rate of 6%.[9] The Commission noted that the most recent issues of notes sold by the company bore a rate of 3¾% interest which rate exceeded the average rate on all the outstanding long term debt. Considering Colorado's contention that this indicated that future interest charges would exceed the weighted average cost of the entire outstanding debt, the Commission said, "But Colorado's contention presupposes that rate making is not a continuing process and that appropriate adjustments of rates cannot be made when experience demonstrates that adjustment is required. We find that the actual cost of the company's outstanding long-term debt and preferred stock is a proper measure of the cost of borrowed money and of preferred stock funds in determining a fair rate of return for Colorado in this case."

While the Commission in its opinion states that there was "in this record an abundance of evidence on the subject of rate of return including average yields for bonds of public utilities, railroads and industrials as well as U. S. Treasury bonds; data on public offerings of natural gas bonds, preferred and common stocks; earnings-price ratios of various natural gas companies' common stocks; natural gas companies' capitalization ratios and data as to Colorado's outstanding securities, its earnings and financial requirements.", it is clear to us that no consideration was given by the Commission to factors other than the financial history of nine natural gas companies subject to the Commission's jurisdiction, whose common stock was held by the public, and seven natural gas companies, whose common stock was traded on recognized exchanges, and the data with respect to Colorado's outstanding securities, its earnings and financial requirements.

From an objective study of the investor's appraisal of the common stock of nine natural gas companies held by the public during the five year period ending August, 1951, the Commission found that investors had required a return on the average on the issues sold to the public of 8.3%. Colorado calls attention to the fact that the exhibit reflecting this study does not contain the names of these companies nor does their name appear in the record. They are, however, the nine gas companies reporting to the Federal Power Commission and it is not contended the information reflected in the exhibit is not correct or that Colorado did not in fact know or could not ascertain which companies were included in the study. The Commission further found that the average earnings price ratio of the outstanding common stock of seven natural gas companies traded on recognized exchanges for the same period to be 8.2%, with the average for the last twelve months of the period of 7.5% and decreasing to 6.4%

9. Colorado had stated to the Securities and Exchange Commission that this debt would be retired on or before December 31, 1952.

as of October, 1951, and that at the latest date shown by the record, July, 1951, the yield varied from 3.5% to 6.4%. The Commission also found persuasive evidence as to the cost of equity capital in the experience of Colorado itself. It alluded to the fact that two principal stockholder groups had offered 966,000 shares of its common stock for sale to the public; that this was the first public offering ever made of Colorado's common stock and represented 56% of the total stock; that the book value of the stock was $13.63 per share; that it was offered at $26.75 to net the selling stockholders $25.25 per share; that based on earnings for 1951 of $1.88 per share the earnings—offering price ratio was 7.03%, and the earnings—net price to the selling stockholders was 7.44%; that the public offering of this stock was oversold. Whether the Commission's finding as to fair rate of return is supported by that substantially required by the decisions must be determined from a consideration of these facts.

■ While it is true that the Commission allowed as an item of cost of service only the weighted average cost of Colorado's outstanding debt of 3.21% and allowed nothing additional because the most recent borrowing reflected a higher interest rate of 3.75%, we do not think this constitutes basic error. The 3.75% issue was included in reaching the weighted average of 3.21%. Sufficient was allowed as a cost of service to retire the entire outstanding debt. Of course, if there was evidence establishing an upward trend in interest rates, it should have been taken into consideration but apparently this one borrowing is all of which there is evidence in the record and of itself is not sufficient to establish a reasonable expectation of a future upward trend. We are of the further view that the record amply supports the Commission's finding that Colorado has no plans for and does not presently contemplate a refinancing program in the near foreseeable future. Under these circumstances, the Commission did not err in refusing to give consideration to the higher interest rate in this one note issue.

■ While as pointed out in Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 288, 88 L.Ed. 333, and related cases, there is no single formula or combination of formulae which may or can be used in determining rates, and as further pointed out, pragmatic adjustments are of necessity involved in rate making procedure, there is a well settled basic principle concerning which there can be no dispute. The rate must be fair and reasonable and, as pointed out in the Hope case, such a rate is one that will produce enough revenue to pay operating expenses, provide for the capital costs of the business, and for a return to the equity owners "commensurate with returns on investments in other enterprises having corresponding risks." As stated by the Supreme Court in the Hope case, "By that standard the return to the equity owners should be commensurate with returns on investments in other enterprises having corresponding risks." The court there approved the method employed by the Commission in reaching its conclusion. It pointed out that the Commission had "considered the financial history of Hope and a vast array of data bearing on the natural gas industry, related businesses, and general economic conditions."

It would seem that the history and experience of other successful companies engaged in the production, transportation and sale of gas would furnish the best guide as to what was fair and adequate. True, there are many companies engaged in the production and transportation of natural gas which apparently were not considered. Most of these are not subject to the Commission's jurisdiction, no doubt because they are local in their operations and not engaged in interstate operations. The record warrants the statement that the Commission gave consideration to all interstate gas companies subject to its jurisdiction and

comparable in operation to Colorado and to all such companies whose common stock was traded on recognized exchanges, as well as to Colorado's outstanding securities, its earnings and financial requirements. It also attached significance to Colorado's experience in the public offering for sale of 56% of its common stock. The fact that this offering was promptly oversubscribed is evidence of the standing of Colorado with the investing public and, if we must as urged by Colorado take into account that the eagerness to purchase this stock was induced in the belief of the future development of Colorado's resources, we must on the other hand not be unmindful that that manifested interest was in the face of a rate hearing which might well, as it did, result in a decrease of rates.

We believe that the experience of other comparable gas utility companies, having a sound financial structure and long experience of successful operation, is a better criterion by which to gauge and determine the adequacy and fairness of rate of return than that of railroads, power transmission companies or other like utilities engaged in other fields and under other conditions and circumstances, or the rate of return on Government bonds or industrial bonds in unrelated enterprises. We do not say that such factors are not proper for consideration but on the other hand failure to give them weighty consideration does not in our opinion constitute reversible error on the record before us in light of the factors that were considered in this case.

While the rate of return of 5¾% is lower than any rate heretofore established which has been called to our attention, that in itself is not suspect nor may we overturn it merely because we as the trier of the facts might have established a higher rate. From the record we cannot say that a rate of return of 5¾% properly computed is unreasonable and therefore confiscatory.

The late case of State Corporation Commission of State of Kansas v. Federal Power Commission, 8 Cir., 206 F.2d 690, in which the findings and order of the Commission were reversed and remanded in part for further consideration with respect to making additional findings, has been called to our attention. It is sufficient to say that in our opinion the two cases are distinguishable and that the facts in this case do not warrant similar treatment other than above indicated.

Summarizing, it is our conclusion that the Commission's findings and order based thereon are supported by the record save only with respect to its findings relating to the loss from the gasoline operations. The disapproval of its treatment of this item makes necessary further consideration by the Commission of the proper base of cost of service. It will also require further consideration of the item of federal income taxes as an element of the cost of service. In all other respects save this the findings and determinations by the Commission are approved.

The order of the Commission is, therefore, Reversed and the cause is Remanded for further proceedings in accordance with the views expressed in this opinion.

BRATTON, Circuit Judge.

I concur in the reversal of the order of the Commission. But I think the reversal should also rest upon the additional ground that the action of the Commission in omitting the intermediate decision procedure constituted error. Where an examiner is named in a proceeding of this kind and he conducts the hearing, the intermediate decision procedure is the general rule; and its omission is the exception. The omission of the intermediate decision procedure is warranted only where the Commission makes a well founded and sustainable finding that due and timely execution of the functions of the Commission imperatively and unavoidably so requires. 5 U.S.C.A. § 1007(a).

The Commission found that due and timely execution of its functions imperatively and unavoidably required it to omit the intermediate decision procedure

in this proceeding. But that primary finding was predicated upon two subsidiary findings. One of such subsidiary findings was that the proceedings had been in progress for a regrettably long period of time. But the Commission expressly stated in connection with such finding that the long delay was not attributable to any one particular party. And the other subsidiary finding was that in view of the fact that the Commission had no power of reparation with respect to past rates, which might or might not prove to be excessive, it appeared that the record in the proceeding presented the kind of situation requiring the omission of the intermediate decision procedure as provided in the Administrative Procedure Act. But in every proceeding of this kind the Commission does not have power of reparation in respect to past rates which are found to be excessive.

Virtually all of the testimony was given by expert witnesses. But their credibility and the weight to be given to their testimony were matters for consideration in resolving conflicts in the testimony respecting basic facts upon which the outcome of the proceeding depended at least in part. The examiner saw the witnesses and observed their demeanor while testifying. He was in the best position to determine their credibility and weigh their testimony. There are no underlying facts apparent upon the face of the record to support the finding that due and timely execution of the functions of the Commission imperatively and unavoidably required the omission of the intermediate decision procedure. And in the circumstances, the omission of such procedure was prejudicial error.

## On Rehearing

HUXMAN, Circuit Judge.

We reversed the Commission's order in the above entitled cause on the ground that it erred in excluding from the cost of service base the loss resulting from the gasoline operations as set out in the opinion [1] and remanded the case for further consideration.[2] We granted the Commission's petition for rehearing because of its contention that we were without jurisdiction to consider that question sua sponte since it was not first presented to the Commission by Colorado in its petition for rehearing. In support of its position the Commission relies upon 15 U.S.C.A. § 717r(b) which in part provides as follows: " * * * No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing * * *."

It is not correct, as stated by the Commission, to say that Colorado did not object to the exclusion of this item. It did object thereto both in the original proceeding and in its petition for rehearing. It is true, however, that it did not place its objection on the legal ground upon which we predicated our conclusions.

But aside from that we think that in reviewing the Commission's order we have inherent power to consider and correct manifest and substantial error appearing in the record which leads to an unjust end result and deprives Colorado of the opportunity of earning that which the law says is its right, namely, a fair return on its investment.

As pointed out in our original opinion, the test laid down by the Supreme Court in all its decisions in which orders of the Commission are to be gauged is the end result test. The principle laid down in those decisions is that if after a consideration by a reviewing court of the order the end result is just and gives the company a fair return on the investment the order will stand. To hold that a reviewing court is by technical rules of procedure before the Commission deprived of the opportunity to view a case in the light necessary to bring about a

---

**1.** The loss as found and deducted by the Commission was fixed at $421,537.

**2.** See opinion filed October 29, 1953.

just end result is to destroy the rule and such a conclusion should not be reached in the absence of clear express language to that effect.

 Neither do we interpret Section 717r(b) to mean that a reviewing court is deprived thereby of its right to consider all relevant matters necessary to determine a just end result. We interpret the pertinent language of the Section to mean that one complaining of the order of the Commission will not be heard and has no standing to urge an objection not first submitted to the Commission. We do not interpret Panhandle Eastern Pipe Line Co. v. Federal Power Commission, 324 U.S. 635, 65 S.Ct. 821, 89 L.Ed. 1241, to hold that a reviewing court may not of its own volition consider fundamental error preventing a just end result. That was not the theory upon which the case was decided in the Circuit Court. It was decided thereupon a consideration of the whole case. The Supreme Court in its opinion did say that the gas company by failing to object in its application before the Commission was precluded from raising the objection in the reviewing court, but it did not expressly hold that the Circuit Court erred in considering the case upon its merits. In fact, the Supreme Court likewise considered the case upon its merits and concluded that the end result was just. It would seem that if the court was without jurisdiction to consider the merits all that was said with respect to the merits was only dicta and should have been omitted from the opinions.

United States v. Hancock Truck Lines, Inc., 324 U.S. 774, 65 S.Ct. 1003, 89 L.Ed. 1357; National Labor Relations Board v. Cheney California Lumber Company, 327 U.S. 385, 66 S.Ct. 553, 90 L.Ed. 739 and Unemployment Compensation Commission v. Aragon, 329 U.S. 143, 67 S.Ct. 245, 91 L.Ed. 136, are urged by the Commission in support of its contention that we lack jurisdiction to consider the question in issue. The Hancock Truck Lines case arose under the Interstate Commerce Act upon an application for a certificate of convenience to operate truck lines. The Commission granted a limited certificate, limiting it in operation to traffic moving on bills of lading of freight forwarders. The applicant filed an application for reconsideration in which it stated, "We do not challenge, nor do we complain against, the restriction to serve only freight forwarders." [324 U.S. 774, 65 S.Ct. 1004.] The Commission denied the other relief requested. The applicant then brought an action to enjoin only so much of the court's order as restricted its application to traffic moving on bills of lading of freight forwarders. A three-judge court issued a permanent injunction. The Supreme Court held that having expressly waived any objection to this part of the order, the carrier was estopped from urging it and it was improper for the court to reverse the Commission's order in respect to a provision therein as to which the litigant had advised that body that it no longer objected but acquiesced.

The Cheney California Lumber Company case arose under the National Labor Relations Act. That Act contains a provision similar to Section 717r(b). Proceedings under the National Labor Relations Act involve problems materially different from those that arise under the Natural Gas Act. That Act concerns itself with facts constituting unfair labor practices. When the facts are once established, the remedy flows as a matter of law. What the court there did was to make a finding of fact with respect to an issue not submitted to the Board and that the Supreme Court said it could not do. But we are not considering for the first time an issue of fact. The loss from the gasoline operation is an established fact and we accept it. We only inquire as to the legal consequences flowing therefrom and what was the Commission's legal duty after having found the fact. So also in the Aragon case, supra, the reviewing court for the first time made a finding of fact with respect to a fact issue not submitted to the Employment Compensation Commission.

Furthermore we are of the view that our conclusion that we have inherent

power to sua sponte note basic erroneous legal conclusions adduced from established facts is strengthened by Section 10 of the Administrative Procedure Act, 5 U.S.C.A. § 1009, which in part provides that "So far as necessary to decision and where presented the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provision * * *. It shall * * * hold unlawful and set aside agency action, findings, and conclusions found to be * * * not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; * * *." To hold that we are precluded from considering the legality or constitutionality of the action of an administrative agency based upon facts found by it and unchallenged in the reviewing court would seem to make nugatory and meaningless these clear and positive mandates of the Section.

It is also of some significance that of the cases relied upon by the Commission, Cheney California Lumber Company and Hancock Truck Lines, Inc., were decided prior to the passage of this Act and, while the Aragon case was decided approximately three months after the effective date of the statute, it did not center around a provision such as we had under consideration. For these reasons, we adhere to the views, expressed in our original opinion.

On the argument on the petition for rehearing it was stressed that prior to the merger order Colorado received all the net revenue from the gasoline operations but that under the merger order it relinquished fifty per cent of such revenues and still bears all the cost thereof and that this is unjust to Colorado's consumers. Our opinion to remand did not indicate the treatment to be accorded to this item of cost of service. All we required was that it be considered as an element of cost of service in light of all the facts of the case.

The order of the Commission is, therefore, reversed and the cause is remanded for further proceedings in accordance with the views expressed herein.