**CANADIAN PACIFIC RAILWAY COMPANY, Minneapolis, St. Paul & Sault Ste. Marie Railroad Company and Northern Pacific Railway Company, Plaintiffs,**

**Great Northern Railway Company, Intervening Plaintiff,**

**v.**

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

**Union Pacific Railroad Company, Intervening Defendant.**

No. 4–57–Civ.–26.

United States District Court
D. Minnesota,
Fourth Division.

Jan. 16, 1958.

Ross L. Thorfinnson, Minneapolis, Minn., for Soo Line & Canadian Pacific Ry. Co.

B. Franklin Taylor, Washington, D. C., for ICC.

W. Louise Florencourt, Washington, D. C., for U. S.

Earl F. Requa, St. Paul, Minn., for Northern Pacific Ry. Co.

R. Paul Tjossem, Seattle, Wash., for Great Northern Ry. Co.

F. J. Melia, Omaha, Neb., for Union Pacific R. R. Co.

Before SANBORN, Circuit Judge, NORDBYE, Chief Judge, and DEVITT, District Judge.

DEVITT, District Judge.

This is an appeal from an order of the Interstate Commerce Commission approving the acquisition of control of the Spokane International Railroad by the Union Pacific Railroad Company under Section 5(2) of the Interstate Commerce Act (49 U.S.C.A. § 5(2)). The plan approved by the Commission called for an exchange of not less than 80% of Spokane International's outstanding capital stock for common stock of the Union Pacific.

This appeal is taken by interested and competing railroads, all of whom intervened and objected to the Union Pacific's petition at the time of the hearing before the Commission.[1]

The plaintiffs here contend that the Commission's action is without support in the evidence, that the Commission erred in refusing to consider the application of the Canadian Pacific Railroad to acquire the Spokane International, and that the interested and objecting parties were denied due process of law principally in that they were deprived of a proposed examiner's report. They ask that the Commission's order be set aside.

The Spokane International is a small, independent railroad whose main line extends about 140 miles north from Spokane, Washington to Eastport, Idaho on the Canadian border. A branch line extends from Coeur d'Alene Junction southeastward to Coeur d'Alene, approx-

1. The interested railroads here involved will be referred to as follows:

Canadian Pacific Railway Company .......... Canadian Pacific
Chicago, Milwaukee, St. Paul
   & Pacific Railroad Company ............. Milwaukee Road
Great Northern Railway Company ........... Great Northern
Minneapolis, St. Paul & Sault Ste.
   Marie Railroad Company ................ Soo Line
Northern Pacific Railway Company ......... Northern Pacific

imately 9 miles. This railroad, commonly referred to as a bridge carrier, serves principally as a conduit of freight traffic between the Canadian Pacific in Canada and several United States railroads. At Spokane it connects with the Milwaukee Road, Great Northern, Northern Pacific, Union Pacific, and the Spokane, Portland & Seattle Railway Company. Connection with the Canadian Pacific is made at the northern terminus at Eastport, Idaho—Kingsgate, British Columbia. There are other connections of lesser importance.

After the Union Pacific filed its application on April 4, 1956, petitions to intervene were granted on behalf of 5 railroads and several other interested groups and trade organizations. Subsequently, the Northern Pacific and Great Northern amended their respective petitions to request that if the Union Pacific's application was not denied, each of them be included in the acquisition on a joint and equal basis with any other railroads also included. In the alternative, the Great Northern sought sole control, and the Northern Pacific contended that the Canadian Pacific should be the sole owner. The Canadian Pacific amended its petition at the hearing and requested authority to acquire exclusive control of the Spokane International. The Milwaukee Road asks only that if other railroads are permitted to participate in the acquisition, it be permitted to participate on an equal basis.

An examiner conducted hearings on the part of the Commission from November 13 through November 16, 1956. All interested parties were heard. Fifty exhibits were received into evidence. The transcript consists of 752 pages. At the close of the hearing, the examiner announced that there would be a proposed report and that briefs would be due simultaneously on December 3, 1956.

However, later, on November 20, 1956, the Union Pacific filed a petition requesting, for reasons later to be recited, that the examiner's proposed report be omitted. This request was granted by the Commission (Division 4) on December 20, 1956. On the same date Division 4 authorized the Union Pacific to acquire control of the Spokane International in the manner sought in its application. The report of the Commission's action is contained in 295 I.C.C. 425. The substance of the Commission's finding is found at page 440:

"We find, subject to the conditions for the protection of railway employees, and the maintenance of existing routes, rates, and channels of trade referred to above, that acquisition of control by the Union Pacific Railroad Company of the Spokane International Railroad Company, through ownership of a majority of capital stock, as described herein, is a transaction within the scope of section 5(2) of the Interstate Commerce Act, as amended; that the terms and conditions proposed are just and reasonable; and that the transaction will be consistent with the public interest."

Subsequently, petitions for reconsideration and oral argument before the entire Commission were filed by these plaintiffs and others. On April 24, 1957 oral arguments were had before the entire Commission. On June 27, 1957, the Commission issued its order and corrected order denying reconsideration and affirming the order of its Division 4, dated December 20, 1956. Appeal to this court followed under 28 U.S.C.A. §§ 1336, 2284 and 2321–2325. The court issued an order staying the effectiveness of the Commission's order pending this decision.

Although well established and generally recognized, the restricted function of the court in reviewing the action of an administrative body should be stated. ■ We are limited to determining whether there is warrant in the law and the facts for the Commission's action. We can go no further. We cannot substitute our judgment for that of the Commission or challenge the wisdom of its action. United States v. Pierce Auto Freight Lines, 327 U.S. 515, 66 S.Ct.

687, 90 L.Ed. 821; Federal Security Administrator v. Quaker Oats Co., 318 U.S. 218, 227–228, 63 S.Ct. 589, 87 L.Ed. 724.

■ "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 54 S.Ct. 692, 694, 78 L.Ed. 1260. See also American Power & Light Co. v. Securities and Exchange Commission, 329 U.S. 90, 112–113, 67 S.Ct. 133, 91 L.Ed. 103.

■ We must consider the record as a whole in appraising the substantiality of the evidence, Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, see 5 U.S.C.A. § 1001 et seq., keeping in mind, however, that the judgment of the Commission " * * * if based on substantial evidence of record, and if within statutory and constitutional limitations, is controlling even though the reviewing court might on the same record have arrived at a different conclusion." Federal Security Administrator v. Quaker Oats Co., supra, at page 228 of 318 U.S., at page 595 of 63 S.Ct.

■ The courts have viewed the administrative authority of the Commission in cases involving the acquisition of control of one railroad by another under section 5(2) of the Interstate Commerce Act (49 U.S.C.A. § 5(2)) as being very broad. McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544; O. C. Wiley & Sons v. United States, D.C.W.D.Va.1949, 85 F.Supp. 542, affirmed 338 U.S. 902, 70 S.Ct. 308, 94 L.Ed. 554.

■ In M. & M. Transportation Co. v. United States, D.C.D.Mass.1955, 128 F.Supp. 296, 298, affirmed 350 U.S. 857, 76 S.Ct. 102, 100 L.Ed. 762, the court labeled the Commission's authority in these cases as "sweeping":

"The courts have continually asserted that the discretion of the Commission in a § 5 proceeding is sweeping, Congress intending that the Commission exercise its expert knowledge in assuring consistency with the public interest, and the exercise of this discretion will not be disturbed if the Commission's findings are adequate in view of the statutory requirements. (Citing cases) * * *."

We have studied and considered the applicable statutes and decisions, the orders of the Commission, the evidence and the arguments of counsel. We conclude that the Commission has reached a permissible conclusion and that there is adequate warrant in the law and the facts for the Commission's action.

In examining the evidence in support of the Commission's findings, it should first be noted that the Commission has long been of the view that the Spokane International should be affiliated with a larger railroad in order to insure its "permanency of operation." See Spokane International Railway Company Reorganization, 221 I.C.C. 230, 224 I.C.C. 315, 228 I.C.C. 387, 233 I.C.C. 157. In the last cited proceeding, 233 I.C.C. 157, 168, the Commission said that:

"* * * in the interest of the reorganized company and in the public interest, the reorganized company should be affiliated with some larger system."

This statement of the Commission and its action in approving Spokane International's acquisition by the Union Pacific were bottomed on the Commission's knowledge of the facts of record, and its expert judgment that, in the public interest, close affiliation with that system was necessary. The Commission said:

"The Union Pacific depends on the Spokane International for its only gateway into Canada. Physically, the two lines are entirely complementary, having an end-to-end connection at Spokane. Acquisition by Union Pacific of control of Spokane International will be consistent with the public interest because, among other things, it will make available to Spokane International the re-

sources and personnel of Union Pacific to further improve the facilities and services of Spokane International, and also assure, which is more important, the permanency of operation of the latter's properties. Both substantial economies and improved performance can be achieved by Spokane International through the use of existing modern mechanical and other facilities and services which the Union Pacific has available at Spokane, and elsewhere on its system. The economies are to be realized in the reduction of overhead transportation expenses, the cost of maintenance, the use of labor saving devices, and general expenses. Under the control of the Union Pacific, a more adequate transportation service to the public by the Spokane International is inevitable. * * *"

This conclusion, the wisdom of which is not for us to question, is supported by substantial testimony and exhibits.

But the plaintiffs argue, that if affiliation of the Spokane International is to be made, it should be with one or more of them singly or jointly. It is predicted that unfortunate economic results to them will follow if the Union Pacific acquires control.

The Commission gave careful consideration to plaintiffs' contentions, both that one or more of them should acquire control and that the plaintiffs would be adversely affected by Union Pacific control.

In so far as its conclusion not to permit the Northern Pacific, Great Northern and Milwaukee to acquire control of the Spokane International is concerned, the Commission noted the uncontradicted evidence in the record to the effect that if one or more of them acquired control, these three railroads would effect abandonment of a substantial portion of the Spokane International's present roadbed and facilities. The Commission looked upon this as an unwise partial dismemberment of the railroad which would lessen competition. It found this to be opposed to the public interest.

Thus the Great Northern, if successful, would abandon approximately 34 miles of Spokane International's right of way from Sand Point to Bonners Ferry and make joint use of the Great Northern's transcontinental main line tracks between those points. Additionally, the Spokane International's bridge across the Kootenai River at Bonners Ferry would be abandoned and use would be made of the Great Northern's bridge there.

It was also proposed that the Great Northern and Milwaukee make joint use of the Spokane International track from Spokane to Grand Junction, where the Great Northern, Spokane International and Milwaukee would make joint use of the Northern Pacific track running from Hauser Junction to Post Falls. The four lines would then operate from Grand Junction to Post Falls over the Northern Pacific and from Post Falls to Coeur d'Alene over the Great Northern and Milwaukee tracks. This plan would bring about the abandonment of approximately 44 miles of trackage.

Further, the Northern Pacific represented that the lines of the Spokane International and Northern Pacific would be coordinated between Grand Junction and Dover, a distance of approximately 48 miles.

The Commission viewed the case with which such coordination could be achieved as evidencing intense competition between the Spokane International on the one hand and the Great Northern, Northern Pacific and Milwaukee on the other, and, notwithstanding the economics which might be effected, concluded that it would not be in the public interest to permit a competitor or a group of competitors to acquire stock control of the Spokane International.

The Commission recited reasons for its conclusion that multiple ownership of the Spokane International by the Northern Pacific, Great Northern and Milwaukee or any two of them would not be in the public interest. It said:

"* * * Such ownership, involving as it does the principal competitors of the Spokane Internation-

al, would result in a conflict of interests which inevitably would lead to a stalemate in matters of policy, solicitation of traffic, physical improvements, and industrial development. The competitors would be more interested in their wholly-owned lines than they would be in the part ownership of the Spokane International. Divided ownership and responsibility, particularly where the interests of those in control may be somewhat opposed, would not be conducive to harmonious results. Any plan calling for control by its competitors offers little or no prospect that the Spokane International's properties would continue to be operated vigorously in the solicitation of rail traffic as they are now. * * * "

It is manifest from other evidence in the record that intense competition exists between Spokane International on the one hand and the Northern Pacific, Great Northern and Milwaukee on the other, and among the last three named railroads.

It is our view that there is in the record an adequate evidentiary basis for the conclusion of the Commission that the public interest would not be best served by single or joint control of the Spokane International by the plaintiffs.

The plaintiffs' assertions that a large volume of traffic would be diverted from their lines if the Spokane International is controlled by the Union Pacific is, we believe, adequately met by the imposition of conditions for the protection of existing through-routes and joint rates. These conditions, 6 in number, are set out in the footnote.[2]

Although the plaintiff railroads complain of the inadequacy of these conditions, they are themselves willing to accept them in the event that one or more of them acquire control of the Spokane International.

■ The Canadian Pacific urges that the Commission erred in refusing to authorize it to acquire sole control of the Spokane International. The Commission, in so far as the Canadian Pacific's application is concerned, said:

" * * * As stated heretofore the Canadian Pacific, at the hearing, announced for the first time that it was interested in acquiring exclusive control of the Spokane International, and submitted an application for such authority. The Canadian Pacific contends that since authority to acquire control of another rail-

---

2. "1. Under applicant's control the Spokane International shall maintain and keep open all routes and channels of trade via existing junctions and gateways, unless and until otherwise authorized by us.

"2. The present neutrality of handling traffic inbound and outbound by Spokane International shall be continued so as to permit equal opportunity for service to and from all lines reaching the rails of that carrier without discrimination as to routing or movement of traffic, and without discrimination in the arrangement of schedules or otherwise.

"3. The present traffic and operating relationships existing between Spokane International, on the one hand, and all lines connecting with its tracks, on the other, shall be continued insofar as such matters are within the control of the applicant, and all contracts now in effect between Spokane International and other railroads shall be continued in full force and effect, subject to cancellations or termination only in accordance with their specific terms and conditions.

"4. The Spokane International shall accept, handle and deliver all cars inbound and outbound, loaded and empty, without discrimination in promptness or frequency of service as between cars destined to or received from competing carriers, and irrespective of origin, destination, or route of movement.

"5. Applicant shall do nothing to restrain or curtail the right of industries located on the Spokane International to route traffic over any or all existing routes and gateways.

"6. Any party or any person having an interest in the subject matter may at any future time make application for such modification of the above conditions, or any of them, and jurisdiction is hereby retained to reopen the proceeding on our own motion for the same purpose."

road under section 5 of the act is permissive only, we could consistently find that it is in the public interest for the Canadian Pacific to acquire control of the Spokane International even though there is no existing contract between the Spokane International stockholders and the Canadian Pacific for the purchase of the stock. We do not agree with this contention. Even though the definitive agreement now held in favor of the Union Pacific terminates by its terms, there is no guarantee that the stockholders of the Spokane International will automatically turn to the Canadian Pacific as the prospective new purchaser. We cannot order those stockholders to deal with the Canadian Pacific, nor can we force a contract to be made in its favor. Consequently, on the present record, the Canadian Pacific has no means of consummating a transaction by which it seeks authority to control the Spokane International. Compare Clinchfield Railway Lease, 90 I.C.C. 113, and Illinois-Missouri Terminal Railway Company, Et Al., Purchase, Etc., supra. We have no assurance that the stockholders of the Spokane International and the Canadian Pacific could agree on terms of the stock acquisition which would be acceptable to us. Under the circumstances, we are unable to approve the acquisition of control requested by the Canadian Pacific. We consider it unnecessary to discuss in detail the evidence presented on behalf of the Canadian Pacific."

This conclusion of the Commission cannot be said to be either arbitrary or capricious. The Canadian Pacific's belated application for authority to acquire the capital stock of the Spokane International without any showing that it had offered to or could acquire it had little if any tendency to prove that the granting of the application of Union Pacific would not be in the public interest.

It was well known for some time in railroad circles that the Spokane International was available for purchase. Prior to its reorganization in 1939 the Canadian Pacific had held a long-time control of the Spokane International. At the reorganization hearing the Canadian Pacific, although afforded the opportunity, chose not to retain control. The President of the Spokane International testified that in the spring of 1955, he made a trip to Montreal, Canada, for the purpose of offering the Spokane International to the Canadian Pacific. The Canadian Pacific was not interested. At the time it filed its petition to intervene in opposition to the Union Pacific's petition in June of 1956, the Canadian Pacific expressed no desire to acquire the Spokane International. It was not until the last day of the Spokane hearing, November 16, 1956, that it filed such an application.

Thus we have a past record of indifference on the part of the Canadian Pacific toward the purchase or control of the Spokane International. The only effect the belated filing of its petition could have had upon the proceeding before the Commission would have been to delay the consummation of a firm transaction which the Commission viewed as being in the public interest and requiring expeditious disposition. The Commission could not have then approved the application of the Canadian Pacific, even if so minded, because the provisions of Sec. 5(2)(b) of the Interstate Commerce Act (49 U.S.C.A. § 5(2)(b)) require that notice of proposals of this kind be given to the governors of each state involved, and that interested parties be afforded a reasonable opportunity to be heard. Although such a notice had been given in connection with the application of the Union Pacific, it had not been given in connection with the application of the Canadian Pacific. Hence, the hearing would have had to be adjourned until some future time.

We therefore conclude that it was proper for the Commission to reject the

256

Canadian Pacific's application, not necessarily because of the lack of a contract to acquire the stock, but because it was the considered opinion of the Commission that the public interest favored a final determination of the controversy in behalf of the Union Pacific, whose petition was then fully and properly before it, and that an indeterminate delay to permit the Canadian Pacific, whose past record and behavior indicated a negative attitude toward acquisition, an opportunity to submit a definite proposal would not be justified.

Finally, the plaintiffs urge that they were denied due process of law, principally in that they were deprived of the proposed examiner's report. It is urged that such a report is required by Section 8(a) of the Administrative Procedure Act (5 U.S.C.A. § 1007(a)).

█ The due-process clause of the Fifth Amendment protects substantial rights of litigants, and it does not require any particular or technical procedures. Inland Empire Dist. Council, etc. v. Millis, 1945, 325 U.S. 697, 710, 65 S.Ct. 1316, 89 L.Ed. 1877; Morgan v. United States, 1936, 298 U.S. 468, 481, 56 S.Ct. 906, 80 L.Ed. 1288. The Morgan case makes it clear that due process is satisfied when a party receives notice and is given an opportunity to be heard and to present evidence and to know and contest the claims of the opposing party and to submit an argument.

In this case the plaintiffs were accorded all of the requirements of due process. Each of them participated fully in hearings at Spokane from November 13 through November 16, 1956, before a designated hearing examiner. The transcript covers 752 pages. Fifty exhibits were received in evidence. The plaintiffs had opportunity to present their own witnesses and to cross-examine the applicant's witnesses. The plaintiffs were accorded an opportunity to submit briefs to Division 4. They submitted arguments in opposition to applicant's petition for an expedited procedure. The plaintiffs filed briefs in support of their petitions for reconsideration of Division

Four's orders. All of the plaintiffs were given an opportunity to argue before the full Commission on April 24, 1957.

It would appear from the oral arguments of the plaintiffs that while they all make reference to the absence of due process, they do not seriously urge that they were deprived of it, except with respect to the absence of the examiner's proposed report.

As previously noted, by its order of December 20, 1956, Division 4 dispensed with the examiner's proposed report. This was done because of representations made to it by the Union Pacific that approval of the Commission was necessary before January 1, 1957 or the agreement to purchase would no longer be effective, and that the principal stockholders of the Spokane International would not agree to extend the contract of purchase beyond that date. Motivated by this argument, the Commission said:

"* * * In view of our decision in the case, we think it is in the public interest to expedite this proceeding as much as possible in order to avoid another hearing on the primary issue of whether it is in the public interest for the Spokane International to become affiliated with a trunk-line carrier or a group of such carriers. Under the circumstances, we find that on the record, the timely execution of our functions imperatively and unavoidably requires expedition. Accordingly, the petition of the Union Pacific to omit the filing of an examiner's proposed report herein will be granted."

But the plaintiffs argue that the Commission had no authority to dispense with the examiner's proposed report, and even if it did, it was arbitrary and unreasonable to do so.

Section 8(a) of the Administrative Procedure Act, 5 U.S.C.A. § 1007(a), provides:

"* * * Whenever the agency makes the initial decision without having presided at the reception of the evidence, such officers [the hear-

ing officers] shall first recommend a decision except that in rule making or determining applications for initial licenses (1) in lieu thereof the agency may issue a tentative decision or any of its responsible officers may recommend a decision or (2) any such procedure may be omitted in any case in which the agency finds upon the record that due and timely execution of its functions imperatively and unavoidably so requires."

Section 10(e) of the Administrative Procedure Act, 5 U.S.C.A. § 1009(e), relating to the scope of review of agency action, provides that " * * * due account shall be taken of the rule of prejudicial error."

The defendants argue that the Commission's order here in question properly may be regarded as "rule making" or as determining an application for an initial license. While the order of the Commission undoubtedly constituted a ruling upon the application of the Union Pacific and authorized it to acquire the capital stock of the Spokane International, the defendants' contention raises difficult and doubtful questions of interpretation, about which we think no definite opinion need be expressed.

■ In controversies which present doubtful fact issues, the determination of which must turn upon the credibility of witnesses and the weight of evidence, we have no doubt that the parties are entitled to an examiner's report; but in cases where the basic facts are definitely established, and where the agency finds that due and timely execution of its functions imperatively and unavoidably requires a prompt decision, and where the parties have been afforded full opportunity to present their evidence and their arguments, and where the only questions for decision are what inferences and conclusions shall be drawn from the facts by the agency which under the law is required to make the decision, we think the failure to have the hearing examiner make a report is not error requiring a

reversal or vacation of the agency's order. See and compare, Kenny v. United States, D.C.N.J., 103 F.Supp. 971, 977–978; Alabama-Tennessee Natural Gas Co. v. Federal Power Commission, 3 Cir., 203 F.2d 494, 497–498; Colorado Interstate Gas Co. v. Federal Power Commission, 10 Cir., 209 F.2d 717, 723, reversed on other grounds 348 U.S. 492, 75 S.Ct. 467, 99 L.Ed. 583.

In the case last cited, where it was contended that the failure of the Federal Power Commission to require an examiner's report was arbitrary and a denial of due process, the court said (at page 723 of 209 F.2d):

" * * * The difference between the parties involved difference of opinion and the inferences and deductions to be drawn from established basic facts. These issues arose in specialized fields calling for the opinion of experts. It was not a question of the credibility of the expert witnesses but rather a question of the weight to be accorded to their opinions. The Commission was as competent to pass on these questions without the examiner's intermediate report as with it because these questions were plainly within the Commission's expert competency."

■ Our conclusion is that in the instant case the Commission's dispensing with the examiner's report in order to expedite the proceedings was not in excess of its powers and was not arbitrary, capricious, or prejudicial. There is no reasonable basis for believing that the Commission would have reached any different result had it required a report from the hearing examiner who took the evidence which the Commission had before it and upon which its order was based.

Other points and arguments have been fully considered, although not discussed.

The complaints of the plaintiffs are dismissed, and the temporary restraining order of August 8, 1957, is vacated.